**Frank BARRETT, Plaintiff–Appellee,**

v.

**Nancy I. HARRINGTON, a/k/a Penny Harrington, Defendant–Appellant.**

**No. 96–6207.**

United States Court of Appeals, Sixth Circuit.

Argued Aug. 5, 1997.

Decided Nov. 20, 1997.

John E. Herbison (argued and briefed), Nashville, TN, for Plaintiff–Appellee.

Barry L. Howard (briefed), Gracey, Ruth, Howard, Tate & Sowell, Nashville, TN, Aaron Wyckoff (argued and briefed), Winston N. Harless (briefed), Lewis, King, Krieg, Waldrop & Catron, Nashville, TN, for Defendant–Appellant.

Before: KEITH and SUHRHEINRICH, Circuit Judges; ROSEN, District Judge.[*]

## OPINION

ROSEN, District Judge.

### I. INTRODUCTION

In a complaint filed September 21, 1995, Plaintiff/Appellee Frank Barrett alleges, pursuant to the provisions of 42 U.S.C. § 1983, that he is entitled to recover damages from the Defendant/Appellant, Judge Nancy ("Penny") Harrington. Mr. Barrett claims that Judge Harrington violated his First and Fourteenth Amendment rights by falsely accusing him of stalking her in retaliation for his efforts in revealing her allegedly illegal conduct as an elected official. Mr. Barrett also asserts a pendent state law claim of defamation under Tennessee common law.

On February 14, 1996, Judge Harrington filed a motion to dismiss, as well as a motion for summary judgment claiming in both that she was entitled to either absolute or qualified immunity. Also on February 14, 1996, Barrett moved for partial summary judgment on the merits of his claims.

On July 30, 1996, the District Court determined Defendant's motion to dismiss was moot, having effectively consolidated it with the motion for summary judgment. The court then granted Judge Harrington's motion for summary judgment in part, finding she was entitled to qualified immunity on Barrett's claim of due process violations, but denied her motion with respect to Plaintiff's First Amendment claim. The court also denied Barrett's motion for summary judgment, finding that genuine issues of material

[*] The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

fact precluded the entry of judgment on the merits of Plaintiff's complaint. We now AFFIRM in part and REVERSE in part.

## II. *FACTUAL BACKGROUND*

This action arises from a well-publicized conflict between the parties. Plaintiff/Appellee Frank Barrett is the owner of a roofing business which, at the time, was involved in an ongoing controversy with the Department of Codes Administration of the Metropolitan Government of Nashville and Davidson County regarding work permits for various projects. Defendant/Appellant Nancy ("Penny") Harrington is an elected Metropolitan General Sessions Judge of Nashville and Davidson County, primarily responsible for the environmental docket.

In September 1994, Barrett appeared before Judge Harrington in Environmental Court regarding two violations of the Environmental Codes. At the conclusion of a bench trial, Judge Harrington rendered judgments in favor of the Codes Department and against Barrett. Mr. Barrett alleges that at the hearing Defendant was "unusually arrogant and irascible . . . and failed to show appropriate respect for litigants appearing before her." (Joint Appendix, p. 30). Based on these observations, Plaintiff determined that Defendant was not "fit . . . to hold public office" and decided to investigate her in order to advocate opposition to her re-election. (J.A., p. 30).

During the course of his investigation, Barrett visited various state and local government offices to gather information regarding Judge Harrington. In the course of this investigation, Mr. Barrett discovered that Judge Harrington had dismissed parking tickets that had been issued to her and her husband.

On February 1, 1995, Mr. Barrett visited the Davidson County Election Commission Offices to request documents about Judge Harrington. While requesting these documents from Joan Nixon, an executive secretary to the Election Commission, Barrett expressed his strong feelings about Judge Harrington and made profane statements. Barrett's remarks and his conduct apparent-ly made Ms. Nixon concerned for Judge Harrington's safety. Although Ms. Nixon did not have a personal relationship with Judge Harrington, Ms. Nixon called Judge Harrington and notified her of Barrett's behavior.

At approximately this same time, Larry Brinton, a television news reporter, called Judge Harrington and told her that Mr. Barrett was investigating her and urging him to do a news story about her concerning the dismissal of the parking tickets. Mr. Brinton also told Judge Harrington that Barrett was very hostile towards her and suggested that she should be concerned for her safety because of Barrett's behavior and demeanor. (The record does not reflect how Judge Harrington responded to Mr. Brinton).

Defendant asserts she became fearful of Barrett after she was informed that he exhibited violent and threatening behavior during his investigation in various public offices. (J.A., pp. 257–58). On February 9, 1995, using her judicial letterhead, Judge Harrington wrote separate letters to State District Attorney General Victor S. Johnson, III and United States Attorney John Roberts, requesting that they investigate Barrett because he was "attempting to obstruct justice by harassing [her] and [her] family," including requiring her to recuse herself from future cases against him, which were likely to arise due to his ongoing dispute with the Codes Department. (J.A., pp. 135–36). Harrington explained in her deposition that she used her judicial letterhead because she "was a judge asking for protection from a disgruntled litigant." (J.A., p. 273). During this same time, Harrington retained Todd Campbell to represent her "in relation to further investigation of possible criminal activity by Mr. Barrett and, possibly, civil suits against him." (J.A., p. 328; J.A., p. 276).

Despite pursuing criminal sanctions against Mr. Barrett, Judge Harrington later admitted in deposition that "[s]omewhere about the same time" that she wrote to state and federal prosecuting attorneys requesting an investigation of the Plaintiff, she reviewed the applicable state stalking statute to determine whether the Plaintiff's conduct fit the

prohibitions of the statute and determined that it did not. (J.A., pp. 268–70).[1]

Apparently in response to Harrington's letter to District Attorney General Johnson, Detective Anna–Maria Williams of the Metropolitan Police Department called Harrington on February 13, 1995 and questioned her about Barrett's actions. Later that same day, Detective Williams filed a police report which listed Harrington as a victim of stalking and Barrett as the suspect. (J.A., pp. 340–41). Also on this day, Barrett made certified copies of the parking tickets issued to Harrington and her husband that she had dismissed. The next day, Detective Williams questioned Barrett about his recent conduct and advised him that he was being investigated for stalking Judge Harrington. (J.A., p. 174).[2]

On February 28, 1995, Harrington, again using her judicial stationary, wrote to Richard H. Dinkins, Chairman of the Davidson County Election Commission, regarding Barrett's attempts to have Nixon fired upon his learning that Nixon had called Harrington about his conduct at the Elections Commission office. (J.A., pp. 259–60, 328). In that letter, Harrington told Dinkins that "Mr. Barrett appears to be 'investigating' or 'stalking' me, depending on one's point of view, as a result of my finding him in violation of the Metro ordinance for refusing to obtain a permit for roofing for hire and refusing to obey a 'stop work order.'" (J.A., p. 328). Harrington also advised Dinkins that she had contacted District Attorney General Johnson and U.S. Attorney Roberts, and that

she had retained Mr. Campbell. (J.A., p. 328).

Thereafter, at a March 1995 General Sessions Judges' meeting, in front of all the other judges, Harrington told Judge William E. Higgins that he should tell his "friend Frank Barrett" to "watch [his] step," because she had retained Todd Campbell to represent her against Barrett, emphasizing that Barrett was "stalking" her and that Mr. Campbell was a prominent lawyer whose clients included Vice–President Al Gore. (J.A., pp. 352, 296–98). Harrington further stated that she had pursued this matter with her "friends" at "8th and Broad," apparently a reference to the federal courthouse. (J.A., pp. 350–52). A few weeks later, Harrington and Higgins encountered each other on the third floor of the Metropolitan Courthouse. Harrington, in front of others, loudly told Higgins that Plaintiff was stalking her and shouted, "Your friend Frank Barrett is a fruitcake." (J.A., p. 353). Higgins described Harrington's demeanor in making each of these statements as "very angry and red-faced and angry at me, sort of venomous." (J.A., p. 354).

In August/September 1995, Barrett gave the information about the parking tickets Harrington had dismissed on behalf of herself and her husband to a reporter at the *Nashville Banner*. This revelation resulted in unfavorable media attention for Harrington. (J.A., pp. 174, 181). On September 7, 1995, Harrington met with Toni Dew, a reporter for the *Nashville Banner* newspaper, who had requested an appointment to interview her. During this interview, which took

1. Harrington herself was apparently "instrumental in the creation" of this stalking law. (J.A., p. 268).

2. The applicable stalking statute in effect at the time provided that:

(a)(1) A person commits the offense of stalking:

(A) Who repeatedly follows or harasses another person with the intent to place that person in reasonable fear of a sexual offense, bodily injury or death;

(B) Whose actions would cause a reasonable person to suffer substantial emotional distress; and

(C)Whose acts induce emotional distress to that person.

(2) As used in this subsection:

(A) "Follows" means maintaining a visual or physical proximity over a period of time to a specific person in such a manner as would cause a reasonable person to have a fear of a sexual offense, bodily injury or death;

(B) "Harasses" means a course of conduct directed at a specific person which would cause a reasonable person to fear a sexual offense, bodily injury, or death, including, but not limited to, verbal threats, written threats, vandalism, or unconsented-to physical contact; and

(C) "Repeatedly" means on two (2) or more separate occasions.

Tenn.Code Ann. § 39–17–315 (1996).

place in the Judge's office behind the jail docket bench, Harrington discussed the parking tickets and stated that Barrett had been stalking, harassing, and otherwise intimidating her. (J.A., pp. 303–11). Harrington's statements appeared in Toni Dew's September 19, 1995 column in the *Nashville Banner*. (J.A., pp. 310, 345).[3]

On September 12, 1995, Mr. Jay Korff, a reporter for WKRN Channel 2 News, showed up on Harrington's doorstep and interviewed Harrington at her home. (J.A., p. 312). This interview, which appeared on the evening news that same day, quotes Harrington as stating that Barrett was stalking her and that she felt threatened and intimidated by him. (J.A., pp. 180–81).[4]

The issues presented on appeal are:

(1) whether the District Court correctly declined to address Harrington's motion to dismiss separately from her motion for summary judgment because Judge Harrington submitted the motion contemporaneously with matters outside the pleadings;

(2) whether Judge Harrington is entitled to absolute or qualified immunity for her letters to prosecuting authorities instigating an investigation of Barrett; and

(3) whether Judge Harrington is entitled to absolute or qualified immunity for the statements she made to the media accusing Barrett of stalking her.

### III.  *STANDARD OF REVIEW*

In this appeal, the Court must review both the District Court's disposition of Appellant's motion to dismiss and motion for summary judgment.

In considering a motion to dismiss for failure to state a claim, the Court is required to take as true all factual allegations in the complaint. *Lamb v. Phillip Morris, Inc.*, 915 F.2d 1024, 1025 (6th Cir.1990), *cert. denied*, 498 U.S. 1086, 111 S.Ct. 961, 112 L.Ed.2d 1048 (1991). Therefore, because the District Court's disposition of the motion to dismiss is based "purely on the legal sufficiency of plaintiff's case," the proper appellate standard of review for the granting or denial the motion is *de novo*. *RMI Titanium v. Westinghouse Electric Corp.*, 78 F.3d 1125, 1134 (6th Cir.1996).

Appellate review of a grant or denial of summary judgment is also *de novo*, utilizing the same test used by the district court to determine the appropriateness of summary judgment. *Bush v. Rauch*, 38 F.3d 842, 846 (6th Cir.1994)(*citing Deaton v. Montgomery County, Ohio*, 989 F.2d 885, 887 (6th Cir. 1993)).

At the district court, summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases, taken in the aggregate, lowered the movant's burden on a summary judgment motion.[5] According to the *Celotex* Court,

> John Seignenthaler: It is a strange story from a woman known as a tough judge. We begin "10 at 10" tonight with this exclusive story. Judge Penny Harrington says recent allegations she abused her power are being fueled by a man who she says used to stalk her. * * * Jay Korff: Judge Penny Harrington admits she still fears for her safety from an alleged stalker.

---

**3.** The September 9, 1995, column includes the following:

> Metro General Sessions Judge Penny Harrington continues to publicly accuse Williamson County businessman Frank Barrett of stalking her. * * *
> During an interview with the Nashville Banner, Harrington said Barrett has been on a "rampage" against her since she fined him $50 in Environmental Court more than a year ago.
> "And ever since then, this man has been absolutely stalking me," Harrington said.

**4.** Some of the statements from the September 12, 1995 broadcast include the following:

> Anne Holt: Good evening, Judge Penny Harrington says she's been stalked and now claims the man is out to ruin her.

**5.** *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. In order to make a showing sufficient to resist summary judgment, the non-movant must counter with more than a mere scintilla of evidence, such that reasonable jury could find for that party. *Bailey v. Floyd County Bd. Of Ed.*, 106 F.3d 135, 140 (6th Cir.1997); *Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994).

## IV. ANALYSIS

### A. Denial of the Motion to Dismiss

■ The first issue presented on appeal is whether the District Court correctly declined to address Judge Harrington's motion to dismiss separately from her summary judgment motion because Harrington submitted the motion contemporaneously with matters outside of the pleadings. Harrington contends the District Court's procedural maneuver denied her the right to seek dismissal on the basis of immunity without having to incur the burdens of litigation. This claim is without merit.

■ A defendant has the right to plead immunity at the dismissal stage and may immediately appeal an adverse ruling before pleading immunity at the summary judgment stage. *Behrens v. Pelletier*, 516 U.S. 299, ——, 116 S.Ct. 834, ——, 133 L.Ed.2d 773, 784 (1996).[6] This procedural safeguard exists to protect government employees from having to expend time and energy fending off vexatious claims relating to their official duties. *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) ("Inquiries of this kind can be peculiarly disruptive of effective government.").

"The entitlement is an immunity from suit rather than a mere defense to liability; and . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). Therefore, the issue of immunity should be resolved at the earliest possible stage of a litigation, *Anderson v. Creighton*, 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523, 535 n. 6 (1987) (*citations omitted*), in order to prevent the litigant from having to endure pretrial matters such as discovery. *Forsyth*, 472 U.S. at 526, 105 S.Ct. at 2815–16.

Harrington filed both her motion to dismiss and her motion for summary judgment on the same date. These motions were filed more than four months after Plaintiff filed his original complaint, and after the parties had completed discovery. Both motions asserted the same substantive issues, and both motions were supported by a single memorandum of law which separately addressed the different forms of relief. Significantly, Harrington filed documents outside the pleadings in support of her summary judgment motion, and in opposition to Plaintiff's.

The District Court explained its decision to hold the motion to dismiss moot in a footnote to the opinion:

As the defendant filed her motion to dismiss and motion for summary judgment together, the Court has before it the motions, memoranda and papers in support. Generally, a motion to dismiss under Rule 12(b)(6) is not accompanied by matters outside the pleading. Upon the submission of affidavits or others matters outside the pleading, the motion is "treated as one for summary judgment and disposed of as provided in Rule 56 . . . ."

Because matters outside the pleading have been presented to and considered by the Court in conjunction with the defendant's motion for summary judgment, the

---

frivolous lawsuits and avoid wasteful trials." 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

6. Moreover, a defendant may appeal a denial of immunity at the summary judgment stage, even if that defendant was denied immunity at the dismissal stage and was subsequently denied dismissal on appeal. *Behrens*, 516 U.S. at ——, 116 S.Ct. at ——, 133 L.Ed.2d at 788.

Court perceives no benefit in doubling its work and considering the Rule 12(b)(6) motion as well. As such, it is rendered moot and will be denied accordingly.

We find that the District Court properly found the motion to dismiss moot, and, therefore, affirm the Court's denial of the motion.

The District Court's decision is supported both by the Federal Rules of Civil Procedure and the substantive law of the above cases. It is well established that a District Court "has complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion." 5A C. Wright & A. Miller, *Federal Practice and Procedure: Civil 2d*, § 1366, pp. 491–93 (1990) (*footnotes omitted*). According to Rule 12(b) of the Federal Rules of Civil Procedure, once "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56. . . ."

In this case, Defendant filed her summary judgment motion and her motion to dismiss simultaneously. Therefore, because Defendant filed matters outside the pleadings in support of her summary judgment motion, the court received that material contemporaneously with the motion to dismiss. The court, exercising its "complete discretion," properly decided to consider those matters when ruling on the motion. The court then acted in accordance with Rule 12 by rendering the motion to dismiss moot, as a summary judgment motion was already pending addressing the same issues.

Furthermore, the court's ruling is consistent with the progeny of immunity cases cited above. In both *Forsyth* and *Anderson*, the Supreme Court stressed the importance of shielding litigants claiming immunity from the hardships of discovery. *Forsyth*, 472 U.S. at 526, 105 S.Ct. at 2815–16; *Anderson*, 483 U.S. at 646 n. 6, 107 S.Ct. at 3042 n. 6. In this case, Defendant did not file the motion to dismiss as an initial response to the complaint. Rather, Defendant filed the motion to dismiss over four months after Plaintiff's initial complaint, long after discovery had closed. Given the procedural posture of the case, the denial of the motion to dismiss did not implicate the policy rationale underlying *Forsyth* and *Anderson*. Defendant was not exposed to any additional hardships as a result of the court's consolidation of the two motions. Based on the foregoing, it is clear that the District Court did not err in addressing the motion for summary judgment rather than the motion to dismiss.

## B. Denial of Motion for Summary Judgment

### 1. Absolute Immunity

The second issue Harrington presents on appeal is whether the District Court erred in ruling that she was not entitled to absolute immunity. The conduct for which Judge Harrington claims immunity include: (1) writing letters to prosecutors the prompting an investigation of Barrett, and (2) statements made in interviews with the news media accusing Barrett of "stalking" her. Harrington argues that her actions "display a consistent and uncontroverted pattern of judicial conduct which is directly related to the preservation of the integrity and security of the Environmental Court and her ability to properly preside over that court, i.e., acts sufficiently within the parameters of her adjudicatory function to entitle her to absolute judicial immunity in this suit." (Appellants brief, p. 36).

The District Court denied Harrington's claim, stating:

> While it may be true that the defendant believed that she was attempting to preserve the integrity of the court, the acts represented the administrative or executive functions as opposed to adjudicative ones. [Cite omitted]. As none of the alleged violations in the present case involve actions of the defendant concerning proceedings in the courtroom or decisions concerning the plaintiff's case, the Court finds that the doctrine of absolute immunity does not apply to bar the plaintiff's claims against the defendant. [Cite omitted].

The District Court accordingly denied Defendant's motion for summary judgment claim of absolute immunity. For the reasons that follow, the District Court erred in hold-

ing the Appellant was not entitled to absolute immunity regarding her letters to prosecuting authorities, but properly ruled Defendant was not entitled to absolute immunity with regard to her statements to the media.

For centuries, the cloak of absolute judicial immunity has shielded judges from claims pertaining to actions they have taken in discharging their official duties. Judicial immunity originated in the Tenth Century, "as a device for discouraging collateral attacks and thereby helping to establish appellate procedures as the standard system for correcting judicial error." *Forrester v. White*, 484 U.S. 219, 225, 108 S.Ct. 538, 543, 98 L.Ed.2d 555 (1988) (*citing* Block, *Stump v. Sparkman and the History of Judicial Immunity*, 1980 Duke L.J. 879). *See also*, Shaman, Lubet, & Alfini, *Judicial Conduct and Ethics 2d.*, pp. 490–91 (1995). The modern justification for the grant of immunity is to preserve the independence of the judiciary by allowing judges to rule without fear of recourse. Immunity protects "judicial independence by insulating judges from vexatious actions prosecuted by disgruntled litigants." *Forrester*, 484 U.S. at 225, 108 S.Ct. at 543.

In another context, the Supreme Court recently reiterated this policy rationale in *Clinton v. Jones:* "immunity serves the public interest in enabling such officials to perform their designated functions effectively without fear that a particular decision may give rise to personal liability." — U.S. ——, ——, 117 S.Ct. 1636, 1643, 137 L.Ed.2d 945 (1997). The Court continued:

As public servants, the prosecutor and the judge represent the interest of society as a whole. The conduct of their official duties may adversely affect a wide variety of different individuals, each of whom may be a potential source of future controversy. The societal interest in providing such public officials with the maximum ability to deal fearlessly and impartially with the public at large has long been recognized as an acceptable justification for official immunity.

*Id.* at —— ——, 117 S.Ct. at 1643–44 (*citing Ferri v. Ackerman*, 444 U.S. 193, 100 S.Ct. 402, 62 L.Ed.2d 355 (1979)).[7]

■ As a general rule, judges are immune from suits for money damages. *Mireles v. Waco*, 502 U.S. 9, 9–10, 112 S.Ct. 286, 287, 116 L.Ed.2d 9 (1991). The Supreme Court has specifically held that state judges are absolutely immune from liability under 42 U.S.C.A. § 1983. *Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217–18, 18 L.Ed.2d 288 (1967).

■ Despite the reverence for judicial immunity, the Supreme Court has been "quite sparing" in their recognition of the doctrine of absolute immunity, and has refused to extend it any "further than its justification would warrant," *Burns v. Reed*, 500 U.S. 478, 486, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991) (*citing Harlow v. Fitzgerald*, 457 U.S. 800, 811, 102 S.Ct. 2727, 2734, 73 L.Ed.2d 396

---

**7.** *See also, Forrester, supra* at 223, 108 S.Ct. at 542 ("By its nature, however, the threat of liability can create perverse incentives that operate to inhibit officials in the proper performance of their duties.... When officials are threatened with personal liability for acts taken pursuant to their official duties, they may well be induced to act with an excess of caution or otherwise to skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct.... Such considerations have led to the creation of various forms of immunity."); *Ireland v. Tunis*, 113 F.3d 1435, 1440 (6th Cir.1997)(Such a far-reaching protection "is justified by a long-settled understanding that the independent and impartial exercise of judgment vital to the judiciary might by impaired by exposure to potential damages liability." (*Citing Barnes v. Winchell*, 105 F.3d 1111, 1115 (6th Cir.1997), *quoting Antoine*

*v. Byers & Anderson, Inc.*, 508 U.S. 429, 435, 113 S.Ct. 2167, 2171, 124 L.Ed.2d 391 (1993))). Of course, a threat of liability would encourage officials to carry out their duties lawfully, and would compensate litigants when they did not. *Forrester*, 484 U.S. at 223, 108 S.Ct. at 542. The Supreme Court's view, however, is that judicial independence and the proper administration of justice outweigh these goals. *See Mireles v. Waco*, 502 U.S. 9, 10, 112 S.Ct. 286, 287, 116 L.Ed.2d 9 (1991) (Although unfairness and injustice to a litigant may result on occasion, "it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself.")(*citing Bradley v. Fisher*, 13 Wall. (80 U.S.) 335, 20 L.Ed. 646 (1872)).

(1982)) [8], and furthermore, "the official seeking the immunity bears the burden of showing that such immunity is justified for the function in question." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 113 S.Ct. 2606, 2613, 125 L.Ed.2d 209 (1993) (*citing Burns v. Reed*, 500 U.S. at 486, 111 S.Ct. at 1939; *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 432–33 n. 4, 113 S.Ct. 2167, 2169–70 n. 4, 124 L.Ed.2d 391 (1993)).

■ Once immunity is established for the conduct in question, however, it "is not overcome by allegations of bad faith or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and eventual trial." *Mireles*, 502 U.S. at 11, 112 S.Ct. at 288 (*citing Pierson*, 386 U.S. at 554, 87 S.Ct. at 1218). In fact, the immunity is overcome in only two instances:

> First, a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in complete absence of all jurisdiction.

*Mireles*, 502 U.S. at 11–12, 112 S.Ct. at 288 (*cites omitted*).

■ The Supreme Court has established a two-prong test to determine whether an act is "judicial." First, the Court must consider whether the function is "normally performed by a judge." *Stump v. Sparkman*, 435 U.S. 349, 362, 98 S.Ct. 1099, 1107, 55 L.Ed.2d 331 (1978).[9] This functional approach examines the "nature" and "function" of the act, not the act itself. *Mireles*, 502 U.S. at 13, 112 S.Ct. at 288 (*cite omitted*).[10] Furthermore, "even if a particular act is not a function normally performed by a judge, we are directed to 'look to the particular act's relation to a general function normally performed by a judge.'" *Barnes v. Winchell*, 105 F.3d 1111, 1116 (6th Cir.1997)(*quoting Mireles*, 502 U.S. at 13, 112 S.Ct. at 288). *See also, Ireland*, 113 F.3d at 1441. Second, the court "must assess whether the parties dealt with the judge in his or her judicial capacity." *Ireland*, 113 F.3d at 1441 (*citing Stump*, 435 U.S. at 362, 98 S.Ct. at 1107–08).

The application of judicial immunity is simple and non-controversial when applied to "paradigmatic judicial acts," or acts of actual adjudication, i.e., acts involved in resolving disputes between parties who have invoked the jurisdiction of the court. *Forrester*, 484 U.S. at 227, 108 S.Ct. at 544. The touchstone for judicial immunity is the function of dispute resolution, or of authoritatively adjudicating private rights. *Barnes*, 105 F.3d at 1116 (*citing Antoine*, 508 U.S. at 435–436, 113 S.Ct. at 2171) (*quotation omitted*). Consequently, "[a]nytime an action taken by a judge is not an adjudication between parties, it is less likely that the act is a judicial one." *Cameron v. Seitz*, 38 F.3d 264, 271 (6th Cir.1994)(*citing Morrison v. Lipscomb*, 877 F.2d 463, 466 (6th Cir.1989)).

Perhaps this cautious approach derives from the Supreme Court's decision in *Forrester*, in which the Court ruled that judges do not receive immunity when acting in administrative, legislative, or executive roles. 484 U.S. at 229–30, 108 S.Ct. at 545–46. In *Forrester*, a former probation officer filed an action against a state court judge alleging she was demoted and discharged on account of her sex in violation of the Equal Protection Clause of the Fourteenth Amendment. The Supreme Court held that the state court judge did not have absolute immunity from

---

**8.** The Court's recognition of qualified immunity makes the broad extension of absolute immunity unnecessary. *Forrester*, 484 U.S. at 224, 108 S.Ct. at 542 (*citing Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90; *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

**9.** *See also, Jones*, — U.S. at —, 117 S.Ct. at 1644 (*quoting Nixon v. Fitzgerald*, 457 U.S. 731, 755, 102 S.Ct. 2690, 2704, 73 L.Ed.2d 349 (1982)); *Burns v. Reed*, 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991); *Westfall v. Erwin*,

484 U.S. 292, 296, n. 3, 108 S.Ct. 580, 583, n. 3, 98 L.Ed.2d 619 (1988); *Forrester v. White*, 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988); *Malley v. Briggs*, 475 U.S. 335, 342–43, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986); *Mitchell v. Forsyth*, 472 U.S. 511, 520–23, 105 S.Ct. 2806, 2812–13, 86 L.Ed.2d 411 (1985).

**10.** *See also, Buckley*, 509 U.S. 259, 269, 113 S.Ct. 2606, 2613 (1993)(the approach examines "the nature of the function performed, not the identity of the actor who performed it." (*Citing Forrester v. White*, 484 U.S. at 229, 108 S.Ct. at 545)).

damages under § 1983 for his decision to demote and dismiss the probation officer because the act was administrative, and therefore not a "judicial act." In so ruling, the Court addressed the distinction between conduct which is adjudicatory in nature and that which is administrative:

> Difficulties have arisen primarily in attempting to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been by judges. * * * This Court has never undertaken to articulate a precise and general definition of the class of acts entitled to immunity. The decided cases, however, suggest an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform. Thus, for example, the informal and ex parte nature of a proceeding has not been thought to imply that an act otherwise within the judge's lawful jurisdiction was deprived of its judicial charac-

ter. *Stump v. Sparkman*, 435 U.S. 349, 363, n. 12, 98 S.Ct. 1099, 1108, n. 12, 55 L.Ed.2d 331 (1978). Similarly, acting to disbar an attorney as a sanction for contempt of court, by invoking a power "possessed by all courts which have authority to admit attorneys to practice," does not become less judicial by virtue of an allegation of malice or corruption of motive. *Bradley v. Fisher*, 13 Wall. at 354, 20 L.Ed. 646. * * * Administrative decisions, even though they may be essential to the very functioning of the courts, have not similarly been regarded as judicial acts. *In Ex parte Virginia*, 100 U.S. (10 Otto) 339, 25 L.Ed. 676 (1880), for example, this Court declined to extend immunity to a county judge who had been charged in a criminal indictment with discriminating on the basis of race in selecting trial jurors for the county's courts.

*Forrester*, 484 U.S. at 227–28, 108 S.Ct. at 544–45.[11]

---

**11.** In the following cases, courts have found that the judges acted in their judicial capacity and were entitled to immunity: *Mireles v. Waco*, 502 U.S. 9, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991)(judge's alleged actions in directing police officers to bring attorney who was in the courthouse into his court were taken in judge's "judicial capacity" and, thus, judge was immune from § 1983 suit, even though judge allegedly directed officers to carry out order with excessive force); *Burns v. Reed*, 500 U.S. 478, 492, 111 S.Ct. 1934, 1942, 114 L.Ed.2d 547 (1991)(issuance of a search warrant is unquestionably a judicial act); *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978)(Indiana circuit court judge performed an act normally performed by judges in approving a mother's ex parte petition to have her 15 year old "somewhat retarded" daughter sterilized); *Sheppard v. Maxwell*, 384 U.S. 333, 358, 86 S.Ct. 1507, 1520, 16 L.Ed.2d 600 (1966)(a judge acts in a judicial capacity when exercising control of the judge's courtroom); *Ireland v. Tunis*, 113 F.3d 1435 (6th Cir.1997)(issuance of an arrest warrant was a judicial act); *Cameron v. Seitz*, 38 F.3d 264, 271 (6th Cir.1994)(state probate court judge's actions of not taking probate court employee's recommendations on disposition of juvenile cases, and barring employee's admittance into court were judicial acts and therefore subject to immunity despite the employee's allegations that judge made his decisions out of hostility arising from the employee's marriage to judge's secretary); *Sparks v. Character and Fitness Committee of Kentucky*, 859 F.2d 428 (6th Cir.1988), *cert. denied*, 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989)(actions taken by State Supreme Court, and Committee on Character and Fitness in denying application for admission to state bar were judicial acts); *Ashelman v. Pope*, 793 F.2d 1072 (9th Cir.1986)(extending judicial immunity to a judge who allegedly conspired with a prosecutor to predetermine outcome of proceeding).

In the following cases, courts have found that the judges acted outside of their judicial capacity and were not entitled to immunity: *Forrester v. White*, 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988)(state court judge did not have absolute immunity from damages suit under § 1983 for his decision to demote and dismiss a probation officer); *Morrison v. Lipscomb*, 877 F.2d 463 (6th Cir.1989)(state court judge was not entitled to judicial immunity in connection with order declaring moratorium on issuance of writs of restitution from December 15 through January 2, as judge was acting in administrative and not judicial capacity); *King v. Love*, 766 F.2d 962, 968 (6th Cir.), *cert. denied*, 474 U.S. 971, 106 S.Ct. 351, 88 L.Ed.2d 320 (1985)(although setting bond on an arrest warrant is a judicial act, the act of deliberately misleading the police officer who was to execute the warrant about the identity of the person sought was nonjudicial); *Sevier v. Turner*, 742 F.2d 262 (6th Cir.1984)(juvenile court judge's initiation of criminal prosecution and civil contempt proceeding against father for child support in arrears constituted nonjudicial acts); *New Alaska Development Corporation v. Guetschow*, 869 F.2d 1298 (9th Cir.1989)(receiver appointed by state court to manage business assets of an estate was entitled to absolute derivative judicial immunity, but receiver was not absolutely immune from al-

This Court just recently addressed the issue of absolute immunity in *McPherson v. Kelsey*, 125 F.3d 989 (6th Cir.1997), in which McPherson brought a civil rights action against Judge Hocking for instigating an allegedly illegal stop and frisk of McPherson after a hearing in which Hocking denied him child visitation rights. Hocking's order for security to search McPherson and remove him from the building stemmed from: (1) McPherson's angry statements to a court officer and court reporter after the hearing; (2) Hocking seeing McPherson in a "Staff Only" area; (3) McPherson "lurking" outside a security door; and other such security concerns. *Id.* at 990–92. Multiple officers responded to the call and conducted a pat-down of McPherson, and a search of his briefcase before escorting him from the building. *Id.* at 991–92. Saying the issue of absolute immunity was a "close call," the panel opted not to decide that question, and instead found qualified immunity applied to Judge Hocking's conduct. *Id.* at 992.

Our opinion is a complement to the *McPherson* opinion. While *McPherson* helped to clarify the scope qualified immunity, this opinion picks up where *McPherson* left off and attempts to clarify the scope of absolute immunity.

### (A) *Letters to Prosecutors*

■ The discrete issue presented here is whether a judge's instigation of a criminal investigation against a disgruntled litigant, taken to protect the integrity of the judicial system, is a "judicial act" and therefore entitled to absolute judicial immunity.

As noted above, the Supreme Court has formulated the two-prong functional test to determine whether an act is judicial. The first prong of the functional approach asks whether the function is one "normally performed by a judge." *Stump*, 435 U.S. at 362, 98 S.Ct. at 1107. Clearly, the instigation of a criminal investigation by the filing of a complaint is not itself a paradigmatic judicial act, i.e., an act which occurs in the context of resolving disputes between two parties. *Forrester*, 484 U.S. at 227, 108 S.Ct. at 544. Beyond the actual rendering of judgments, orders, and other acts of actual adjudication, examples of acts which are directly involved in judicial decision making include ordering police to bring an attorney before the judge [12], approving a petition relating to the sterilization of a minor [13], disbarring an attorney as a sanction [14], issuing a search warrant [15], controlling the courtroom [16], and issuing an arrest warrant [17]. Thus, the act of writing a letter of complaint to prosecuting authorities is distinguishable from these acts, as this type of conduct can, and usually is, undertaken by a citizen complainant or law enforcement personnel. Furthermore, the instigation of criminal proceedings, by definition, is not adjudicatory in nature and does not resolve a dispute between two parties, but rather initiates one.

However, the functional approach focuses on "the nature of the function performed, not the identity of the actor who performed it." *Buckley*, 509 U.S. at 269, 113 S.Ct. at 2613–14. *See also*, *Mireles*, 502 U.S. at 13, 112 S.Ct. at 288–89; *Forrester*, 484 U.S. at 229, 108 S.Ct. at 545. This process necessitates abstracting the nature of the act from the particular act at issue, i.e., looking at "the particular act's *relationship* to a function

legations that he stole assets or slandered parties, as such alleged acts were not judicial); *Harper v. Merckle*, 638 F.2d 848 (5th Cir.), *cert. denied*, 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981)(holding a contempt proceeding and ordering plaintiff incarcerated were not judicial acts where controversy that led to incarceration did not center around any matter pending before the judge, but around domestic problems of plaintiff former wife who worked at the courthouse); *Harris v. Harvey*, 605 F.2d 330 (7th Cir. 1979), *cert. denied*, 445 U.S. 938, 100 S.Ct. 1331, 63 L.Ed.2d 772 (1980)(allegedly repeated communications to the press and city officials which were critical of police lieutenant, and the improper instigation of criminal proceedings against the lieutenant by judge as part of a racial campaign to discredit lieutenant were not judicial acts).

12. *Mireles*, 502 U.S. 9, 112 S.Ct. 286.

13. *Stump*, 435 U.S. 349, 98 S.Ct. 1099.

14. *Bradley*, 13 Wall. at 354.

15. *Burns*, 500 U.S. 478, 111 S.Ct. 1934.

16. *Sheppard*, 384 U.S. 333, 86 S.Ct. 1507.

17. *Ireland*, 113 F.3d 1435.

normally performed by a judge." *Barnes,* 105 F.3d at 1116 (*quoting Mireles,* 502 U.S. at 13, 112 S.Ct. at 288–89)(emphasis added). For example, in *Mireles,* the particular act was the judge's order for the police officers to bring the attorney before him, with excessive force. In reviewing the claim of immunity, the Court's focus was on the more general act of ordering counsel before the court, rather that the issue of the use of force. *Mireles,* 502 U.S. 9, 112 S.Ct. 286.

In *Martinez v. Winner,* the Tenth Circuit addressed the scope of judicial immunity regarding several highly questionable acts by Judge Fred Winner, (then) the Chief Judge of the United States District Court for the District of Colorado, in Francisco Martinez's criminal prosecution.[18] 771 F.2d 424 (10th Cir.1985). One of these unusual acts was Judge Winner's assignment of the Martinez case to himself, in contravention of local practice and rules, allegedly to insure a conviction. *Martinez,* 771 F.2d at 434. The Tenth Circuit denied Martinez's contention that the assignment of the case was an administrative act, rather than a judicial act:

> Although it is an "administrative" act, in the sense that it does not concern the decision who shall win a case, the assignment of cases is still a judicial function in the sense that it concerns the case deciding process, and by statute it is the responsibility of the chief judge, Judge Winner in this case.

*Martinez,* 771 F.2d at 434.

In this case, Judge Harrington's letters to prosecutors did not concern whether Mr. Barrett would win or lose the case. However, the letters did involve the "case deciding process," as the Judge wrote to express her fear that the harassment would cause her to have to recuse herself from future cases involving Mr. Barrett—recusal is undoubtedly an act that concerns judicial decision-making.

Judge Winner also wrote letters to the Justice Department and other law-enforcement officials accusing Martinez of being the catalyst for bringing together terrorist groups, and charging that he was obstructing justice. The court ruled that Judge Winner was entitled to immunity for writing the letters because he "had a duty to notify the proper authorities if he felt a crime was being committed in his courtroom." *Martinez,* 771 F.2d at 435.

In this case, it makes no difference that Barrett's alleged obstruction occurred outside the courtroom; if the alleged intimidation of jurors in *Martinez* occurred in their homes rather than in the court, the conduct still would have amounted to obstruction. Nor does it matter that the intimidation was directed towards a judge, rather than a juror—an intimidation of a judge serving as the trier of fact is equally as obstructive as intimidation of jurors. If Judge Harrington believed Mr. Barrett's actions amounted to obstruction she had a duty to report to the proper authorities, and therefore she must be immune from liability for doing so.[19]

The particular conduct in question here is the letters Judge Harrington wrote to state

---

**18.** *Martinez* was vacated and remanded by *Tyus v. Martinez,* 475 U.S. 1138, 106 S.Ct. 1787, 90 L.Ed.2d 333 (1986), to determine whether the case had become moot because the plaintiff had directed his counsel to withdraw from actively litigating the case. *Martinez* was reversed in non-relevant part by *Martinez v. Winner,* 778 F.2d 553 (10th Cir.1985). Because this Court only looks to the case as persuasive authority, it is irrelevant that the case has been vacated; the case occurred in the Tenth Circuit and therefore this Court would not be bound by the decision even if it had not been vacated. Furthermore, the case was recently cited in *McPherson v. Kelsey,* 125 F.3d 989, 992 (6th Cir.1997).

**19.** Furthermore, during Martinez's trial, Judge Winner held a secret meeting with the United States Attorneys, at which time the Judge expressed apprehension that the jury was being intimidated by spectators, and that Martinez might be acquitted. *Martinez,* 771 F.2d at 432–433. The Judge stated he wanted cameras installed in the courtroom to record the intimidation, which he felt constituted obstruction of justice, and agreed with the prosecutors that a mistrial would be declared. *Id.* The Tenth Circuit ruled:

> If a judge feels a jury is being intimidated by spectators, it is his responsibility to notify proper law enforcement agencies and have the possible crime investigated. A judge is not only entitled but also has a duty to take all lawful measures reasonably necessary to prevent the occurrence of a crime in his courtroom.

*Martinez,* 771 F.2d at 435.

and federal prosecutors which prompted an allegedly spurious investigation into whether Barrett was attempting to obstruct justice. Bearing in mind that Judge Harrington was told by Joan Nixon and Larry Brinton that Barrett was acting in a hostile and threatening manner towards her, and that both had expressed concern for her safety, Judge Harrington clearly had reasonable grounds to contact District Attorney General Johnson and United States Attorney Roberts on her judicial letterhead to prompt an investigation into obstruction of justice charges. Judge Harrington's letter stated in pertinent part:

I wish to request a formal investigation by your office of Frank Barrett of Nolensville, Tennessee. It is my belief that Mr. Barrett who is a roofing contractor and who has been a defendant before me in a suit by Metropolitan Government charging him with failure to obtain permits before working on a roof, is *attempting to obstruct justice by harassing me and my family*. The purpose of the harassment is to create circumstances that would appear to require me to recuse myself from cases enforcing the Metropolitan Codes against him.

On information and belief, Mr. Barrett or his agents, have trespassed at my home and have followed me and my husband. Not only do I believe there is obstruction of justice, I am also fearful of Mr. Barrett, based upon his erratic and threatening behavior in the various offices he has visited.

(J.A. p. 135)(emphasis added).

The District Court found Judge Harrington was "prompted by her fear that *in her role as a judge,* she had aggravated a litigant such that he had developed a personal vendetta against her and that she was acting to preserve the integrity of the judicial system." (Memorandum of the Court, p. 9).

After stripping Judge Harrington's act of its particularities and peculiarities, we find the general function of Judge Harrington's conduct in writing to the prosecuting authorities was to protect the integrity of the judicial decision-making process. Clearly, there was a direct relational nexus between Harrington's judicial decisions, Barrett's response in "investigating" and threatening her, and Harrington's response in contacting the prosecuting attorneys. Based upon what Ms. Nixon and Mr. Brinton told her that Barrett had said about her, and their expression of concern for her safety arising out of his conduct, Judge Harrington understandably felt threatened by Barrett's statements, and the letters she wrote to the prosecutors were clearly designed to address and deter such conduct, and directly related to her role in adjudicating the case which engendered Barrett's conduct in the first place. Just as a judge's citation for contempt against a party who obstructs justice is a judicial act taken to preserve integrity of the judicial system, so too is the instigation of criminal proceedings against a disgruntled litigant whose conduct may amount to obstruction.[20] It would make little sense, and only promote form over substance, for us to say that a judge's response in redressing threatening conduct which she physically observes (e.g., contempt) is entitled to the cloak of judicial immunity, but her action in redressing a threat arising in reaction to her adjudicatory actions which she is told of by others is not entitled to the same level of immunity. The import is in the nexus between the Judge's action which gave rise to the threat and her response to the threat, not simply the response itself.

We, therefore, hold that in circumstances in which a judge reasonably perceives a threat to himself or herself arising out of the judge's adjudicatory conduct, the judge's response, be it a letter to a prosecutor or a call to the Marshall's office for security, is a judicial act within the scope of judicial immunity.

---

**20.** Plaintiff alleges that Judge Harrington's motives were taken out of bad faith because she allegedly knew the stalking statute did not apply to Barrett's conduct. This allegation does not undermine the application of immunity for several reasons: first, although Harrington alluded to the stalking law in her letters, she specifically complained of obstruction of justice in relation to her role as a judge; second, because of the functional analysis we do not focus on the particulars of the act; third, the Supreme Court has clearly ruled that immunity "is not overcome by allegations of bad faith or malice...." *Mireles,* 502 U.S. at 11, 112 S.Ct. at 287–88.

Thus, we must reject the District Court's conclusion that Judge Harrington sent her letters to prosecutors in an administrative capacity, rather than a judicial one. The District Court ruled that act was administrative because it did not involve courtroom proceedings or decisions concerning Mr. Barrett's case. (Memorandum of the Court, p. 11). However, the applicability of judicial immunity is not limited to acts which occur within the confines of the courtroom, and consequently, acts performed outside of the courtroom are not, *ipso facto*, non-judicial acts.

■ The second prong of the functional approach assesses "whether the parties dealt with the judge in his or her judicial capacity." *Ireland*, 113 F.3d at 1441. As noted above, the District Court ruled Judge Harrington's action did not involve decisions concerning Mr. Barrett's case. However, Barrett's entire course of conduct was focused on Harrington's judicial role. First, he dealt with Harrington in her judicial capacity when she presided over Barrett's case involving two codes violations, and it was at that time that Barrett formulated his opinion that Judge Harrington was unfit to hold office, and began his "investigation" campaign. Second, all of his activities, from his "investigation" campaign, to his comments to others about her, to the disclosure to the media of her ticket dismissals, were in response to her judicial decisions and conduct. Given this chain of related activities, Barrett clearly dealt with Judge Harrington in her judicial capacity.

As the Supreme Court has noted, the doctrine of judicial immunity exists to ensure that, in discharging their official responsibilities, judges will act without fear for their personal liability. *Clinton*, — U.S. at —–—, 117 S.Ct. at 1643–44; *Forrester*, 484 U.S. at 223, 108 S.Ct. at 542. If a disgruntled litigant is permitted to upset that

equilibrium by threatening or harassing a judge and the judge must fear personal liability if he or she reports that harassment to authorities, the judges's ability to deal impartially and without fear will be seriously undermined. Even more to the point, the litigant, empowered to subject the judge to liability for reporting the conduct, can affect the judge's ability to sit on cases involving that litigant, thereby effectively creating a situation wherein the litigant will not have to answer to that judge or even appear before the judge.[21] This enables the litigant to "forum shop" by effecting the recusal of a judge through the litigant's own threatening or harassing conduct.

If the judge were not free to address this conduct by complaining to law enforcement without fear of liability, the judge's freedom of action in insuring the integrity of his or her decision-making process, and, indeed, his or her decisions themselves, will be jeopardized. Any result which did not extend immunity to judges acting to protect the integrity of the judicial decision-making process would seriously undermine judicial independence, a cornerstone of a judge's capacity to sit and decide cases.

Therefore, because Harrington dealt with Barrett in her judicial capacity, and because we find that a judge instigating a criminal investigation against a disgruntled litigant who has harassed her is a judicial act, we find that Judge Harrington is entitled to absolute judicial immunity regarding her statements to prosecuting authorities.[22]

### (B) *Statements to the News Media*

■ The next discrete issue presented on appeal is whether Judge Harrington's allegedly false statements to the media qualify for absolute judicial immunity.

It is well-settled that the making allegedly false statements to the news media does not

---

**21.** Indeed, in this case, Judge Harrington ultimately felt compelled to recuse herself in a subsequent proceeding involving Plaintiff.

**22.** Because we hold that Judge Harrington is entitled to absolute immunity here, we need not address the issues of qualified immunity which this case presents. Suffice it to say, however,

that even if absolute immunity did not apply, qualified immunity would certainly apply to Judge Harrington's letters to prosecutors. *See, e.g., McPherson*, 125 F.3d at 993–94 (judges instigation of a stop and frisk of a disgruntled litigant was objectively reasonable, and therefore entitled to qualified immunity).

qualify as a judicial act. In *Buckley,* a murder defendant against whom charges been dropped, brought a § 1983 action against prosecutors claiming malicious prosecution. Among his various claims, Buckley claimed that during the prosecutor's public announcement of the indictment, State's Attorney Fitzsimmons made false assertions about numerous pieces of evidence which tied him to the murder. The Court ruled that Fitzsimmons statements to the media were not entitled to absolute immunity. The Court reasoned that, under the functional approach, statements to the media "have no functional tie to the judicial process just because they are made by a prosecutor." *Buckley,* 509 U.S. at 277, 113 S.Ct. at 2617–18.[23] The Court clarified the scope of absolute immunity with regard to defamatory statements:

> [Absolute immunity] does not apply to or include any publication of defamatory matter before the commencement, or after the termination of the judicial proceeding (unless such publication is an act incidental to the proper initiation thereof, or giving legal effect thereto); nor does it apply to or include any publication of defamatory matter to any person other than those to who, or in any place other than that in which, such publication is required or authorized by law to be made for the proper conduct of the judicial proceedings.

*Buckley,* 509 U.S. at 277 n. 8, 113 S.Ct. at 2618 n. 8 (*citing* Veeder, *Absolute Immunity in Defamation: Judicial Proceedings,* 9 Colum.L.Rev. 463, 489 (1909)(*footnotes omitted*)). *See also, New Alaska Development Corporation v. Guetschow,* 869 F.2d 1298 (9th Cir.1989)(holding that while a receiver appointed by the court to manage an estate was entitled to judicial immunity from suit claiming mismanagement, receiver was not absolutely immune from allegations that he stole assets or slandered the plaintiff).

In *Harris v. Harvey,* the Fifth Circuit ruled that a judge was not immune from liability stemming from allegedly slanderous statements made to the news media accusing the plaintiff of criminal conduct. 605 F.2d 330 (6th Cir.1979). The judge seeking immunity made repeated communications to the press and city officials over the course of more than a year, including calling the plaintiff "a fixer, a briber, and a sycophant." *Harris,* 605 F.2d at 334. The court ruled that, "[s]uch acts were not judicial because they were not functions normally performed by a judge, and were not "to the expectations of the parties" in that as to these acts the parties did not deal with him in his judicial capacity...." *Harris,* 605 F.2d at 336.

Similarly, Judge Harrington's statements to the media cannot be said to be related to her duties as a judge. Even in the abstract, speaking to the media and giving interviews about a litigant on a case over which the judge has presided is not normally a judicial function nor is it usually in furtherance of a judicial function. Indeed, many, if not most, judges will not speak to the media concerning cases of litigants who have appeared before them. Unlike filing a complaint with law enforcement concerning a disgruntled litigant who is harassing a judge, speaking to the media concerning that litigant in no way protects the integrity of the judicial institution or the decision-making process. Although it is an understandable human instinct to defend one's self in the media when attacked publicly, such a defense is not a judicial function—it is self-defense. The distinction here is a clear one. When a judge makes a complaint to law enforcement concerning a litigant's conduct which is adversely affecting or obstructing the judicial process, that judge is requesting some official action in connection with the judicial process. In contrast, an interview with the media concerning the litigant furthers no official act or sanction, it simply informs the public about the judge's position or views.

Therefore, when Judge Harrington communicated to the media regarding Mr. Barrett, she stepped out of her judicial role, and is not entitled to absolute judicial immunity for those acts.

---

**23.** The Court further stated: "The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory to these functions." *Buckley,* 509 U.S. 259, 113 S.Ct. 2606.

### 2. Qualified Immunity

The next issue presented on appeal is whether the District Court erred in ruling that Judge Harrington was not entitled to qualified immunity for liability under § 1983 stemming from the allegedly false statements she made to the media in retaliation for Barrett's investigation of her.[24]

Mr. Barrett alleges Judge Harrington "unlawfully retaliated against him for lawfully gathering damaging information from a variety of sources of public information in order to oppose the Defendant's future political endeavors, which information included evidence of the Defendant's criminal conduct in office, and the Defendant again unlawfully retaliated when the plaintiff disclosed evidence of the Defendant's criminality to a news reporter." (Appellee's Brief, p. 10). Specifically, Mr. Barrett complains of statements originating from an interview Judge Harrington had with *Nashville Banner* reporter Toni Dew, which took place in the Judge's office, in which Harrington discussed the parking tickets and stated that Barrett had been stalking, harassing, and otherwise intimidating her. (J.A., pp. 303–11). Plaintiff also complains of a September 12, 1995, interview with a reporter for WKRN Channel 2 News, who showed up on Harrington's doorstep and interviewed Harrington at her home. (J.A., p. 312). This interview, which appeared on the evening news that same day, quotes Harrington as stating that Barrett was stalking her and that she felt threatened and intimidated by him. (J.A., pp. 180–81).[25] Harrington claims she is entitled to qualified immunity from the claim that her statements constituted a retaliation in violation of 42 U.S.C. § 1983.

■■■ Before determining whether Judge Harrington is entitled to qualified immunity, we must first examine whether Mr. Barrett properly alleged a violation of 42 U.S.C. § 1983. We articulated the test for determining whether a governmental action was taken in retaliation for First Amendment speech in *Ratliff v. Wellington Exempted Village Schools Board of Education,* 820 F.2d 792 (6th Cir.1987). In *Ratliff,* which involved the alleged retaliatory firing of a public employee, we stated:

> The parties agree that under *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), if a public employee alleges that his employer took adverse action against him in retaliation for his exercise of first amendment rights, the following analytical approach must be applied:
>
> (1) The threshold question is whether the plaintiff's conduct deserves constitutional protection.
>
> (2) If the court finds that an employee's conduct was protected by the first amendment, the finder of fact must determine whether the action taken was because he engaged in the protected conduct. The employee's protected conduct must be a "substantial factor" or a "motivating factor" in the employer's decision.
>
> (3) Once the employee meets this burden, the burden shifts to the employer to prove that the actions the employee is complaining about would have taken place absent the protected conduct.

*Ratliff,* 820 F.2d at 795 (6th Cir.1987). *See also, Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr,* —— U.S. ——, ——, 116 S.Ct. 2342, 2347, 135 L.Ed.2d 843 (1996).

■■■ Using this approach, the first issue is whether Mr. Barrett himself engaged in constitutionally protected conduct. *Ratliff,* 820 F.2d at 795. Barrett argues that his criticism of Judge Harrington, and his exposure of her wrongdoing is protected by the First Amendment. He is clearly on sound constitutional ground here. "Criticism of government is at the very center of the constitutionally protected area of free discussion." *Rosenblatt v. Baer,* 383 U.S. 75, 85, 86

---

**24.** Because we ruled that Judge Harrington is entitled to absolute immunity from liability for statements she made to prosecutors, we need not address whether she was entitled to qualified immunity for the same conduct. Therefore, the only issue remaining is whether she is entitled to qualified immunity for her statements to the media. See footnote 23, *supra.*

**25.** See footnotes 4 and 5, *supra,* for text of the statements Judge Harrington made to the media.

S.Ct. 669, 675–76, 15 L.Ed.2d 597 (1966).[26] Mr. Barrett's opinion and consequent criticism of Judge Harrington is conduct that falls well within the ambit of the First Amendment's protections.[27] Freedom to criticize public officials and expose their wrongdoing is at the core of First Amendment values, even if the conduct is motivated by personal pique or resentment.[28]

Having found Barrett's conduct protected, we next inquire into whether Barrett's First Amendment conduct was a "substantial" or "motivating" factor in Judge Harrington's conduct, and, if so, whether she has put forth any evidence to prove her conduct would have taken place absent the protected conduct. Nothing in the record suggests that Judge Harrington would have told the media that Barrett was stalking her if Barrett had not begun to investigate and criticize her. She admitted in deposition that in her legal opinion Barrett was not violating the stalking laws, yet she repeatedly accused him of stalking her in the media. According to the deposition testimony of Harrington's colleague, Judge William Higgins, Harrington loudly told Higgins that Barrett was stalking her and shouted, "Your friend Frank Barrett is a fruitcake." Higgins described Harrington's demeanor in making each of these statements as "very angry and red-faced and angry at me, sort of venomous." These statements reveal the possibility that in speaking to the media, Harrington did have a retaliatory motive to publicly humiliate and denigrate Barrett. These inferences raised by the evidence of record to date are sufficient to create a question of fact and avoid summary judgment for Judge Harrington.

■ Having ruled that Barrett presented enough evidence to survive summary judgment on the actual violation, the inquiry now turns to determination of whether Judge Harrington is entitled to qualified immunity. In cases in which absolute immunity does not apply, "qualified immunity may nonetheless shield a public official from civil liability under § 1983." Cameron, 38 F.3d at 272. Qualified immunity protects government employees from liability for the performance of their discretionary functions when they meet the objective legal reasonableness test. The Supreme Court has articulated the test as follows:

We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate *clearly established statutory or constitutional rights* of which a reasonable person would have known.

*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)(*citing Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978)(emphasis added)); *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975); *McPherson,* 125 F.3d at 992.[29] The

---

26. *See also, Bridges v. California,* 314 U.S. 252, 270, 62 S.Ct. 190, 197, 86 L.Ed. 192 (1941)("It is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions.").

27. As noted, Barrett formed his belief during his hearing that she was "arrogant and irascible." (J.A., p. 30). Based on this belief, Barrett determined that Harrington was not "fit ... to hold public office" and decided to investigate her in order to advocate opposition to her re-election. *Id.*

28. Obviously, if the conduct spills over into illegal activities such as threats or harassment that amount to the obstruction of justice, the First Amendment's protections end, and the official may respond with appropriate sanctions, including reporting to law enforcement. See discussion supra, concerning a judge's absolute immunity to report possible illegal conduct.

29. As the District Court noted, there are a number of ways a public official can establish a defense of qualified immunity.

First, qualified immunity will be sustained if the parameters of the federal right at issue were not sufficiently clear at the time the defendant acted. *See Procunier v. Navarette,* 434 U.S. 555, 564, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978). Second, if the interest asserted by the plaintiff was clearly protected by federal law, but it was not clear whether an exception permitted the defendant's acts, the defendant is entitled to immunity. *Forsyth,* 472 U.S. at 535 n. 12, 105 S.Ct. at 2820 n. 12. Third, the defendant is entitled to immunity is she can show that "it was objectively reasonable for [her] to believe that [her] acts did not violate those rights," even if the parameters of the plaintiff's rights were clearly established. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). (Memorandum of the Court, p. 13).

*Harlow* Court "adopted this criterion of "objective legal reasonableness," rather than good faith, precisely in order to "permit the defeat of insubstantial claims without resort to trial." " *Behrens*, 516 U.S. at ——, 116 S.Ct. at 838 (*citing Harlow*, 457 U.S. at 819, 813, 102 S.Ct. at 2739, 2735–2736).

To survive Defendant's assertion of qualified immunity, Barrett must show that, under § 1983, Harrington's conduct: (1) violates Barrett's clearly established constitutional rights, (2) of which a reasonable person would have known. *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, or the district court itself, *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir.1994), or case law from other circuits which is directly on point, *Cameron*, 38 F.3d at 272–73 (*citing Mumford v. Zieba*, 4 F.3d 429, 432 (6th Cir.1993)). As stated above, it is evident that the First Amendment right to criticize public officials is well-established and supported by ample case law. Furthermore, it is well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983. *See e.g., Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr*, —— U.S. ——, ——, 116 S.Ct. 2342, 2347, 135 L.Ed.2d 843 (1996)("The First Amendment's guarantee of freedom of speech protects government employees from termination because of their speech on matters of public concern."); *Mt. Healthy City Bd. Of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).[30]

Not only is this right clearly established, but Harrington knew or should have known that she may have been violating Barrett's First Amendment rights when she accused him of stalking to reporters from the *Nashville Banner* and WKRN Channel 2 News.

Harrington stated in her deposition that she had reviewed the applicable stalking statute and determined it did not apply to Barrett's conduct. Despite this admission, Harrington repeatedly accused Barrett of stalking her in the media, apparently to counteract Barrett's consistent public criticism of her.

Harrington's statements to the press fail the objective legal reasonableness test because her conduct violated clearly established First Amendment rights of which a reasonable person in her position would have been cognizant. Therefore, we affirm the District Court's ruling not to grant summary judgment to Judge Harrington on the basis of qualified immunity.[31]

## V. CONCLUSION

In conclusion, we **REVERSE** the District Court's ruling that Judge Harrington was not entitled to absolute judicial immunity for letters she wrote to prosecuting authorities requesting an investigation of Barrett's potential obstruction of justice. We hold that a judge is entitled to absolute immunity when contacting prosecutors to prompt an investigation of conduct by a disgruntled litigant which may constitute obstruction of justice in connection with an action or decision taken or made by the judge in his or her adjudicatory capacity. We **AFFIRM** the District Court's ruling that Judge Harrington was not entitled to absolute immunity for her statements to the media, because such statements are not judicial acts. We also **AFFIRM** the District Court's ruling that Judge Harrington was not entitled to qualified immunity for her statements to the media.

---

**30.** *See also, McBride v. Village of Michiana*, 1994 WL 396143 (6th Cir.)(*unpublished disposition*)(*citing Georgia Ass'n of Educators v. Gwinnett County School Dist.*, 856 F.2d 142 (11th Cir.1988)(denial of union dues checkoff privileges in retaliation for First Amendment activity is actionable); *Rakovich v. Wade*, 850 F.2d 1180 (7th Cir.1988), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988)("an investigation conducted in retaliation for comments pro-

tected by the first amendment could be actionable under section 1983")).

**31.** Although not raised by the parties on appeal, we direct their attention, and that of the District Court, to the question of whether Judge Harrington was, in making her statements to the media, acting "under color of law" for the purposes of § 1983.