*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0063P (6th Cir.)
File Name: 00a0063p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LARRY LUCAS, d/b/a LUCAS
TOWING,

Plaintiff,

SOTTILE'S INC., d/b/a
S.T.A.R. TOWING; JAMES
SOTTILE,

Plaintiffs-Appellants,

v.

MONROE COUNTY; CARL
VAN WERT, Sheriff; RONALD
COLE, Undersheriff; DARWIN
PAZ, Captain; TOM
HOFFMAN, Captain,

Defendants-Appellees.



No. 98-1876

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 96-72332—Paul D. Borman, District Judge.

Argued: September 22, 1999

Decided and Filed: February 18, 2000

1

Before:  MERRITT and CLAY, Circuit Judges; ALDRICH, District Judge.[*]

———————————

**COUNSEL**

**ARGUED:** Matthew E. Krichbaum, SOBLE & ROWE, Ann Arbor, Michigan, for Appellants.    Linda E. Taylor, JOHNSON, ROSATI, LABARGE, ASELTYNE & FIELD, Farmington Hills, Michigan, for Appellees. **ON BRIEF:** Matthew E. Krichbaum, Richard A. Soble, SOBLE & ROWE, Ann Arbor, Michigan, for Appellants.  Marcia L. Howe, JOHNSON, ROSATI, LABARGE, ASELTYNE & FIELD, Farmington Hills, Michigan, for Appellees.

———————————

**OPINION**

———————————

CLAY, Circuit Judge.  Plaintiffs-Appellants, James Sottile and Sottile's Inc., d/b/a S.T.A.R. Towing, appeal from the order entered by the United States District Court for the Eastern District of Michigan, granting summary judgment on behalf of Defendants-Appellees, Monroe County and related parties, in this action alleging that Defendants violated Plaintiffs' rights under both the United States and Michigan constitutions, and are liable for tortious interference with Plaintiffs' economic relations.  For the reasons set forth below, we REVERSE in part and AFFIRM in part the judgment of the district court.

———————————

[*] Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

wrongful conduct take the form of inducing a third party not to enter a contract with the plaintiff; indeed, the Restatement Second of Torts § 766B expressly states that a defendant is liable for intentional interference with prospective contractual relations "whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation, or (b) preventing the [plaintiff] from acquiring or continuing the prospective relation." RESTATEMENT SECOND OF TORTS § 766B.  Plaintiffs have presented evidence that the Sheriff's wrongful conduct in excluding him from the regular tow rotation prevented him from entering into a business relationship with stranded motorists who request tow services via central dispatch. Accordingly, we conclude that Plaintiffs have adduced sufficient evidence from which a rational trier of fact could find that the individual Defendants are liable for tortious interference with Plaintiffs' economic relations.

For the reasons set forth above, we REVERSE the judgment of the district court as to Plaintiffs' claims of retaliation for public criticism, political patronage, and tortious interference with economic relations claims; we AFFIRM the judgment of the district court as to Plaintiffs' due process claim.

existence of a valid business relationship or expectancy; (ii) knowledge of the relationship or expectancy on the part of the defendant; (iii) intentional interference causing or inducing a termination of the relationship or expectancy; and (iv) resultant actual damage. *See Wilkerson v. Carlo*, 300 N.W.2d 658, 659 (Mich. 1980). The district court dismissed Plaintiffs' claim on grounds that Plaintiffs' "business relationship or expectancy of a relationship with a third party is too attenuated in this case."

"The [business relationship or expectancy of a relationship] must be a reasonable likelihood or a probability, not mere wishful thinking." *Trepel v. Pontiac Osteopathic Hosp.*, 354 N.W.2d 341, 348 (Mich. Ct. App. 1984). To demonstrate such a realistic expectation, Plaintiffs must prove an anticipated business relationship with an identifiable class of third parties. *See Schipani v. Ford Motor Co.*, 302 N.W.2d 307, 314 (Mich. Ct. App. 1981). Plaintiffs have presented evidence of a reasonable expectancy of an economic relationship with stranded motorists who arranged for towing services via the call list maintained by the Sheriff's Department. Plaintiffs have presented evidence (i) that but for the Sheriff's unlawful and improper conduct — specifically, his patronage practices — Plaintiffs would have been placed on the regular rotation upon satisfying the requirements of the Sheriff's Department; and (ii) that placement on the list entitles a tow company to calls and contracts within its geographic area that the company would not otherwise receive. While the amount of towing business Plaintiffs would have received if placed on the call list cannot be specifically determined, this issue goes only to damages.

In dismissing Plaintiffs' claim, the district court, quoting from *Baker Driveaway Co., Inc. v. Bankhead Enterprises*, 478 F. Supp. 857, 860 (E.D. Mich. 1979), asserted that in the typical tortious interference case, the defendant "induces a private third party not to enter into a contract with the plaintiff in some improper fashion." The court concluded that "[t]he facts of this case are simply inapposite to such a claim." (J.A. at 44.) However, there is no requirement that the tortfeasor's

## BACKGROUND

### *Procedural History*

On March 19, 1996, James Sottile and Larry Lucas, two separate wrecker service operators in Monroe County, Michigan, filed suit in state court, in their own behalf and in the names of their separate wrecker service companies, against Defendants alleging violation of 42 U.S.C. § 1983 and various state law claims. Plaintiffs and Lucas alleged improper and retaliatory conduct arising out of the Monroe County Sheriff's Department's ("Sheriff's Department") administration of the County's list of wrecker companies to be called for towing services. Specifically, the complaint charged that Plaintiffs and Lucas were removed from this tow call list in retaliation for making public criticisms of the Sheriff's Department, in violation of their First Amendment rights under the United States Constitution and Article I of the Michigan Constitution; that the Sheriff's Department exercised political patronage in its administration of the tow call list, also in violation of the First Amendment and the Michigan Constitution; that Plaintiffs and Lucas were removed from the tow call list without due process of law, in violation of their constitutional due process rights guaranteed by the Fourteenth Amendment of the United States Constitution; and that the Sheriff's Department's conduct constituted tortious interference with Plaintiffs' and Lucas' economic relations. Defendants removed the action to federal court on May 20, 1996. On February 27, 1998, following discovery, Defendants moved for summary judgment.

On July 1, 1998, the district court entered an order granting in part and denying in part Defendants' motion for summary judgment. Defendants' motion for summary judgment was denied on Lucas' retaliation claim, but granted on Plaintiffs' retaliation claim, on grounds that Plaintiffs were not regular service providers to Monroe County ("County"); summary

judgment was also granted on all of Plaintiffs' and Lucas' remaining claims.[1] This timely appeal followed.

### Facts

The County Sheriff's Department maintains a towing company rotation list. The call list is maintained to allocate towing services to assist police officers in moving stranded vehicles throughout the County. When an officer needs towing services, the police dispatcher calls a company listed as approved to tow in the "service area" where the tow is needed. If the first towing company called is unavailable, the dispatcher calls the next company listed for that area, and so on until the job is accepted. If towing services are again required, the dispatcher begins with the next company listed for the area involved, in rotation.

A towing company may not be placed on the call list unless the Sheriff's Department authorizes the company's eligibility. Eligibility is based on a number of factors: (i) where the company is located; (ii) whether the location is an area saturated with other companies on the list; (iii) whether the company is properly insured; (iv) whether the company has certain kinds of towing vehicles; (v) whether the company passes a safety and equipment inspection; and (vi) whether the company maintains twenty-four hour service in the service area. However, if a motorist whose vehicle requires towing requests a particular towing company, the dispatcher contacts that company for the job regardless of whether the company requested is on the Sheriff's Department's call list. There are no contracts, either written or oral, between the towing

---

[1] Notably, the district court, quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986), held that the County may be held liable under § 1983 for the Sheriff's decisions regarding operation of the tow list, noting that municipal liability may be imposed where a "deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." (J.A. at 43.) The district court also held that the County may be held liable for any violations of the Michigan Constitution. (J.A. at 43.)

---

that "several references to and procedures for removal or suspension from the list to compel compliance with the regulations reflect the mutual nature of the relationship established by inclusion on the list." *Id.* at 853. In this case, there are no such established "procedures" for suspension or removal. The written policies of the Sheriff's Department — however unfair they may be — explicitly provide that a wrecker company may be immediately removed from the list upon making a complaint to an unauthorized person. As a result, these policies did not create a legitimate claim of entitlement to remaining on the tow call list even after making such complaints. Accordingly, Plaintiffs' due process claim was properly dismissed on grounds that they have not established the existence of a constitutionally protected property interest.

## IV. Tortious Interference with Economic Relations

Plaintiffs allege that by excluding them from the regular tow rotation, the individual Defendants prevented them from entering into business with stranded motorists who obtain towing service through the call list.[8] The elements of a claim for tortious interference with economic relations are: (i) the

---

[8] Notably, the County is immune from tort liability here under Michigan's Governmental Tort Liability Act ("GTLA"), Michigan Compiled Laws Annotated § 691.1407, which provides that "all government agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function." Mich. COMP. LAWS ANN. § 691.1407(1) (1987). However, because Plaintiffs allege an intentional tort for which the individual Defendants would have been liable before July 7, 1986, these Defendants are not immune from suit under the GTLA. *See* MICH. COMP. LAWS ANN. § 691.1407(1) (1987) (stating that "subsection (2) [which covers immunity for individuals] shall not be construed as altering the law of intentional torts as it existed before July 7, 1986"). "Michigan does not immunize its governmental employees, including police officers, from their intentional torts." *Koehler v. Smith*, 1997 WL 595085 (6th Cir. Sept. 25, 1997) (unpublished disposition); *see also Sudul v. City of Hamtramck*, 562 N.W.2d 478, 479 (Mich. Ct. App. 1997) (holding that "an individual employee's intentional torts are not shielded by our governmental immunity statute").

### III. Due Process

Plaintiffs allege that their removal from the stand-by tow call list without notice and an opportunity to be heard violated their due process rights.   The district court dismissed Plaintiffs' claim on the ground that they lacked any protected property interest in remaining on the stand-by list.  We agree with the district court.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interest that a person has already acquired in specific benefits." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972).  The mere unilateral expectation of continuing to receive a benefit is not enough to create a protected property interest; instead a "legitimate claim of entitlement" must exist.  *Id.* at 577.  "[A] property interest exists and its boundaries are defined by 'rules and understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'"  *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 141 (6th Cir. 1997) (quoting *Roth*, 408 U.S. at  577).

In the instant case, however, Plaintiffs can point to no ordinance, contract or other "rules of mutually explicit understandings" that support their claim of entitlement to remain on the stand-by list. *See Perry v. Sinderman*, 408 U.S. 593, 601 (1972). The only relevant policy on record, in place since 1991, expressly states that a wrecker service will be removed from the call list upon filing a complaint with an unauthorized person. Plaintiffs' reliance on *Gregg v. Lawson*, 732 F. Supp. 849 (E.D. Tenn. 1989), is misplaced. In *Gregg*, the court held that the plaintiff had a "legitimate claim of entitlement" in remaining on the wrecker tow list, on grounds

---

consider this question below because it dismissed Plaintiffs' constitutional claims on other grounds, and the parties' briefing of this issue on appeal is sparse and deficient.  This issue is best left for the district court to address in the first instance, should Defendants choose to raise it on remand below.

companies and the Sheriff or the County regarding towing services.  Payment for towing services is made by the motorist directly to the towing company; the County is not responsible for payments to the towing company.

In 1991, the Sheriff's Department announced that towing companies were required to bring grievances they had regarding the list directly to the Sheriff's Department personnel prior to airing such grievances publicly.  Towing companies who failed to comply with this requirement risked removal from the call list.  The Sheriff's May 9, 1991, letter to all towing companies then on the list, stated in part:

> This is to remind you that, consistent with the present procedure, any complaints/questions you may have regarding tow calls are to be directed to Undersheriff Cole in writing.  Do not address these issues with the dispatchers, deputies, or supervisors.
> In the future, failure to abide by these procedures will necessitate the removal of your name from the call list at the time you contact an unauthorized person until the time of your complaint is received in writing and throughly investigated.

(J.A. at 114.)

By the mid-1990's, Sheriff Van Wert ("Sheriff") was subjected to increasing public criticism regarding his administration of the tow call list.  Accusations were rampant that the Sheriff's Department gave preferential treatment to tow companies owned by "higher end" contributors to the Sheriff's political campaigns.  In fact, the Sheriff admitted at his deposition that Dorothy Galina, owner of Monroe Towing, was a "higher end" campaign contributor.  Plaintiffs adduced evidence at their deposition indicating that Monroe Towing received preferential treatment compared to other tow companies on the call list:  (i) Monroe Towing was the only tow truck company in two areas, and received the greatest number of calls; (ii) Monroe Towing's service area was increased in size to the detriment of another tow truck operator, Larry Lucas; and (iii) Monroe Towing received

increased territory when another tow company, McClain's, went out of business. Plaintiffs also adduced evidence that another tow company, Owens Towing, received preferential treatment in exchange for political favors.

Sottile, the sole owner of Sottile's, Inc., d/b/a S.T.A.R. Towing ("S.T.A.R."), applied to be placed on the call list in December 1993. Sottile stated that he had four tow trucks that could perform light and heavy duty towing. Plaintiffs' equipment was inspected, but deficiencies were found in Plaintiffs' equipment. Plaintiffs immediately cured the deficiencies to the County's satisfaction; nonetheless, their application was rejected, as Defendants claimed that the County already had sufficient towing services available in Plaintiffs' geographic service area, Area 8. The Sheriff's February 24, 1994, letter to Plaintiffs stated: "[a]t the present time their [sic] are no intentions to add to our towing services. In April we will be reviewing the services and if we decide to add you will be considered." (J.A. at 254.) However, Plaintiffs noted that in January of 1994, Interstate Towing went out of business in Area 8, thereby leaving only Monroe Towing to service that area.[2] Sottile maintained that S.T.A.R. could have merely taken Interstate Towing's place.

On April 2, 1994, Plaintiffs again reapplied to be placed on the call list for Areas 4 and 8. After three weeks with no response, Plaintiffs contacted Captain Tom Hoffman of the Sheriff's Department. Hoffman reportedly told Plaintiffs that the County had no intention of adding any additional towing services because it did not want to place a financial burden on other tow services and put a good towing company out of business. Hoffman then named three towing companies on the call list that supposedly served the areas for which Plaintiffs had applied. However, Sottile replied that two of those companies were out of business and the third never served those areas. Notably, Hoffman did not name the only

---

[2]Police records that track the tow companies used by the County confirm that Monroe Towing did the vast majority of the towing in Area 8.

because it had refused the new mayor's request for a campaign contribution and had instead supported his opponent. *O'Hare*, 518 U.S. at 720. The Court stated:

> We cannot accept the proposition . . . that those who perform the government's work outside the formal employment relationship are subject to what we conclude is the direct and specific abridgement of First Amendment rights alleged in this complaint. As respondents offer no justifications for their actions, save for insisting on their right to condition a continuing relationship on political fealty, we hold that the complaint states an actionable First Amendment claim.

*Id.* at 720. The same holds true here. Plaintiffs have presented evidence that both Plaintiffs and Lucas were removed from the tow call list because they voiced their opposition to the Sheriff and his policies in a public forum; not only may this conduct itself constitute a violation of the First Amendment, but it provides strong evidence that, as a general rule, a wrecker service's political support for the Sheriff (or lack thereof) factors heavily into the Sheriff's administration of the tow call list. Indeed, by promptly removing his most vociferous critics from the tow call list, the Sheriff inevitably sent a clear message to the County's other wrecker services about the importance of maintaining a positive relationship with the Sheriff's Department. Accordingly, we find that Plaintiffs have presented sufficient evidence to create a genuine issue of material fact on their political patronage claim, and, therefore, summary judgment was inappropriate.[7]

---

[7]Defendants on appeal also briefly argue that they are entitled to qualified immunity on Plaintiffs' First Amendment claims on the basis that, at the time in question, "there was no law establishing Plaintiffs' rights to be added to the [tow call] list." (D. Br. at 43-45.) Plaintiffs respond that Defendants are not immune because the First Amendment law on retaliation and political patronage was clearly established at the time of Defendants' misconduct, so that Defendants knew or should have known that they were violating Plaintiffs' rights. *See, e.g., Chappel*, 131 F.3d at 580; *Barrett*, 130 F.3d at 262-64. The district court did not

from tow companies. Second, Sottile quoted Dorothy Gallina, owner of Monroe Towing, as saying that she had to "wine and dine [members of the Sheriff's Department] and buy them tickets to here and there to keep them happy." (J.A. at 196.) Third, Sottile quoted the owner of another towing company as telling him that "[i]f you want to get on the list, you have got to spread some money around with the sheriff's campaign." (J.A. at 267.) Fourth, Sottile testified that officers in the Sheriff's Department had "jokingly" told him if he wanted to be added to the tow call list, he would have to donate to the Sheriff's campaign.[6]

The Sheriff's conduct in removing Plaintiffs and Lucas from the tow call list in response to their public criticisms of his office constitutes particularly striking evidence of political patronage in his administration of the list. This conduct is akin to a government official firing a public employee who spoke out in opposition to the official or his policies - the classic political patronage First Amendment violation. *See, e.g., Branti v. Finkel*, 445 U.S. 507, 515 (1980) (stating that the First Amendment prohibits officials from terminating public employees on the basis of their political beliefs). In *O'Hare Truck Service*, the Court held that the plaintiff towing company had stated a claim of political patronage in violation of the First Amendment, where the plaintiff alleged that it had been removed from the defendant city's towing rotation list

---

[6]The district court found that this evidence carried no weight since Sottile himself characterized the officers as making their statements "jokingly" and said that he did not take it seriously at the time. However, the weight to be attributed the officer's statements is for the jury to decide. As Plaintiffs point out, the mere fact that the statement was made in a "joking" manner does not render it devoid of truth. A jury viewing this exchange in the light most favorable to Plaintiffs could reasonably construe it as evidence in support of Plaintiffs' political patronage claim, particularly in light of the aggregate evidence that Plaintiffs have adduced. *See, e.g., NLRB v. Homemaker Shops, Inc.*, 724 F.2d 535, 550 (6th Cir. 1984) ("threatening or manipulative statements can . . . be couched in ostensibly friendly, or even humourous, terms [but] [t]he threat or manipulation remains nonetheless") (citing *Seligman & Assocs., Inc. v. NLRB*, 639 F.2d 307, 309 (6th Cir. 1981)).

active towing company that was actually serving Area 8 at that time: Monroe Towing. Hoffman assured Plaintiffs he would look into the situation. Over the next several months, Sottile tried again to contact Hoffman. After his efforts were unsuccessful, Sottile spoke to Undersheriff Ronald Cole, who repeated what Hoffman had said.

On January 5, 1995, Sottile wrote a letter to a member of the Monroe County Board of Commissioners ("Board") setting forth his frustrations with the Sheriff and the tow list; this letter recounted in detail Sottile's efforts to be placed on the list and his futile communications with the Sheriff's Department. On January 30, 1995, Sottile's attorney requested that Plaintiffs be placed on the list.

At this juncture, the facts central to Plaintiffs' claims occur in the public eye and must be viewed from the perspective of public controversy. Allegations of impropriety reached their peak in the winter and spring of 1995. These allegations were particularly salient because they came at a time when the Board was contemplating the merger of central police dispatch, which administered the call list, with the County's Emergency Management Division. The Sheriff opposed the merger on grounds that it would encroach the independence and authority of the Sheriff's Department.

Allegations concerning the Sheriff's administration of the call list first became front page news in February of 1995 when Dale Zorn, a member of the Board, and County Administrator/Auditor Charles Londo were denied access to a meeting the Sheriff held with tow truck operators on the call list. Sottile was also excluded from this meeting. Zorn said that he had been invited to the meeting in his capacity as a commissioner to discuss the potential merger of central dispatch and emergency services. After being refused admittance, Zorn wrote a public letter severely criticizing the Sheriff.

On February 27, 1995, the Sheriff appeared before the Board to respond to Zorn's charges. The Sheriff's comments and the dispute in general were thoroughly covered in a

lengthy front-page article in the February 28, 1995, *Monroe Evening News*, entitled, "Sheriff rips Zorn, Londo over tow meeting." According to the article, the Sheriff told the Board that Zorn had no reason to attend the meeting with call list participants, which, he said, addressed only issues of interest to companies on the list - including rumors "that tow truck company owners must contribute to his campaign to get on the list." The article reported:

> Sheriff Van Wert said the meeting was to inform drivers of new salvage vehicle forms, introduce them to acting Capt. Paz and *address rumors among tow truck operators*. One such rumor, according to the sheriff, was that he intends to eventually have only two tow truck companies on the rotating list.
>
> * * *
>
> The other rumor, Sheriff Van Wert told the board, was that tow truck company operators must contribute to his campaign to get on the list. 'If they want to donate to my campaign, sure, I'll take a donation,' said the sheriff, who said he spends about $80,000 for each election. 'But it's surely not a requirement. That would be illegal and I wouldn't participate in that.'
>
> Campaign statements show that the sheriff's campaign received donations of $2,050 since 1992 from Dorothy Galina, owner of Monroe Towing . . . which is on the tow list.

(J.A. at 248.) The article further reported that Sottile spoke at the Board meeting and complained about his exclusion from the Sheriff's prior meeting with tow truck operators:

> The sheriff's statement came on the heels of remarks earlier in the meeting by Jim Sottile, owner of Star Towing in LaSalle, who said he also was removed from last week's meeting after initially being allowed in. Mr. Sottile said he's been trying to get in the tow list for more than a year now. He said no one at the Sheriff's

(Areas 4 and 8). Monroe Towing's area was increased after another wrecker service went out of business.

Moreover, Plaintiffs have set forth additional evidence that these companies benefitted at the expense of non-contributing tow companies, including Plaintiffs and Lucas. For example, the Sheriff reduced Lucas' towing area by one-third, with the lost territory going to Owens Towing. Monroe Towing received calls for towing service in Lucas' area, even though Monroe was not formally assigned that service area. When Plaintiffs applied to be placed on the regular rotation list, Plaintiffs were told that the County did not require additional towing services in that area — even though Monroe Towing was the only service operating there at that time. When Plaintiffs were finally placed on the stand-by list, they were again excluded from Area 8 and instead assigned to Area 4 — which already had three other wrecker services. Thus, while the Sheriff's Department claimed that it limited the number of companies on the call list in order to avoid saturating an area and to avoid driving a good service out of business, the circumstantial evidence detailed above would allow the jury to infer a less proper motive; specifically, that the Sheriff sought to reward political supporters at the expense of those who did not contribute to his campaigns. *See Acosta-Orozco*, 132 F.3d at 103 n.6 (noting that rewarding political supporters is a forbidden form of political patronage because it necessarily comes at the expense of "those who are not followers and who see their upward mobility . . . thwarted in very concrete ways").

Indeed, the Sheriff's statements and reported comments of other tow companies in the County further suggest a connection between campaign contributions and favorable treatment from the Sheriff's Department. First, the Sheriff publicly stated that it cost $80,000 to run for office and, while denying that campaign contributions were a requirement for placement on the tow call list, said that "if they want to donate, sure I'll take donations." (J.A. at 306.) Sottile testified that, despite the Sheriff's professed denial, he took this very statement as an indirect solicitation of contributions

establish a prima facie case of politically discriminatory [employment action]." The court noted that it had long held that direct evidence was not required to prove political favoritism; instead, circumstantial evidence can suffice: "[v]ictims of heavy-handed uses of the spoils system are not limited to redress in only those (relatively rare) instances in which a 'smoking gun' can be produced. To the contrary, we have held, time and again, that circumstantial evidence alone can support a finding of political discrimination." *Id.* at 102 (quoting *Anthony v. Sundlun*, 952 F.2d 603, 605 (1st Cir. 1991)).

Here, Plaintiffs adduced sufficient evidence from which a rational trier of fact could conclude that the Sheriff's Department improperly engaged in political patronage practices in its administration of the tow call list. Most notably, Plaintiffs have provided evidence that campaign contributors and political supporters received disproportionate tow calls off the list and increased service areas, at the expense of non-contributors. Moreover, Plaintiffs have shown that Plaintiffs and Lucas were removed from the list because of their public opposition to the Sheriff.

Furthermore, Plaintiffs presented evidence suggesting that the Sheriff rewarded his political supporters, Monroe Towing and Owens Towing, with favorable treatment at the expense of wrecker services who did not contribute to his campaigns. The Sheriff stated at his deposition that he knew who his "higher-end" contributors were, and went as far as to identify Monroe Towing as one of them. Owens Towing was also known to be one of the Sheriff's political supporters. There is ample evidence that both companies, particularly Monroe, benefitted from a disproportionate number of calls and increased service areas. For example, in 1995, Owens Towing received over 600 calls from the Sheriff - first on the list. That year, Monroe Towing received over 300 calls, which was second on the list. Monroe Towing was the only company on the tow call list for Area 8. Monroe Towing was the only wrecker service operating in two different areas

department will respond to his letters or phone calls. . . . Sheriff Van Wert said he planned to meet with Mr. Sottile today to discuss his concerns.

(J.A. at 248.)

After the February 28, 1995, Board meeting, the Sheriff did in fact arrange to meet with Sottile. Sottile arrived with his attorney, and the Sheriff, himself an attorney, told Sottile to return on another day, without his lawyer. According to Sottile, when the meeting finally took place, the Sheriff promised to place S.T.A.R. on the regular rotation. However, on April 6, 1995, Sottile was notified that S.T.A.R. was placed on the stand-by list in Area 4. Plaintiffs claim that their placement in Area 4 was another act of favoritism to Monroe Towing, in that they were excluded from Area 8, where Monroe Towing had a monopoly. In contrast, Area 4 was already being served by three wrecker services.

Meanwhile, public complaints about the Sheriff's administration of the call list continued to mount. On March 14, 1995, a stranded driver told the Board that he was forced to wait an extraordinarily long time because the Sheriff's Department refused to call the tow service of his choice and instead called Owens Towing - owned by one of the Sheriff's political supporters - which was some distance away.

On April 11, 1995, wrecker service owner Larry Lucas, who had been on the regular rotation since 1968, spoke at the Board meeting to voice his complaints about favoritism and corruption in the Sheriff's administration of the tow list. Among other things, he alleged that Monroe Towing had been given calls in what had been Lucas' area for almost thirty years. Lucas then explained that he tried to get maps from the Sheriff's Department that showed the areas, but to no avail. Lucas finally received a copy of the map, and discovered that his area was decreased by one-third, and that his former territory was given to Owens Towing. Additionally, at the Board meeting, Lucas reported an incident wherein Commissioner Richard Petticrew, one of the Sheriff's allies, delivered a message to Lucas, from the Sheriff that if he did

not "back off," he would be removed from the tow call list. Lucas concluded:

> If this is going to take place, where [the Sheriff] can dictate . . . then I say central dispatch should be taken out of the Sheriff's Department and give it to the citizens and let the citizens run it. . . . I think you're going to gave a bigger problem later on down the road than you realize.

(J.A. at 316.)

The events at this Board meeting were reported in the lead story in the next day's *Monroe Evening News*:

> A Petersburg wrecker service owner Tuesday night accused Sheriff Carl Van Wert of threatening his business if he doesn't quit challenging tow truck policy. Larry Lucas, in a heated speech to the Monroe County Board of Commissioners, named Commissioner Richard Petticrew as the messenger who told him two weeks ago his business would be dropped from the sheriff's tow list if he 'didn't back off.' . . . 'I can't accept this kind of threat,' [Mr. Lucas] continued 'is there a monopoly or a conspiracy here? You tell me.'

(J.A. at 250.) The article reported Lucas' comments to the Board in some detail; the article further reported that after making his complaints public, Lucas was immediately dropped from the call list "because he failed to comply with procedures requiring complaints to be made in writing."[3] The article also included a sub-story entitled, "How the sheriff's system works." This story, relying on the Sheriff as its primary source, explained that the Sheriff's Department sought to keep the tow list limited, and relayed the Sheriff's

---

[3] In a subsequent June 5, 1995, letter confirming Lucas' removal from the tow call list, the Sheriff's Department made clear that he was being penalized for "the accusatory remarks about the Sheriff and his wrecker policy [he] made before a Board of Commissioner's meeting on April 11, 1995." (J.A. at 153.)

claim of retaliation in violation of their rights under the First Amendment.

## II.  Political Patronage

The First Amendment prohibits government officials from making employment decisions, such as hiring or firing, based on the employee's political beliefs, affiliation, or support. *See, e.g., Rutan v. Republican Party of Ill.*, 497 U.S. 62, 77-79 (1990) (holding that the First Amendment extends to protect against the politically motivated failure to promote); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments."). In *O'Hare Truck Serv. Inc. v. City of Northlake*, 518 U.S. 712, 726 (1996), the Supreme Court held that private companies that provide services to the government — expressly including wrecker services on municipal tow truck rotation lists — are entitled to the same "First Amendment safeguards of political association afforded to employees."

In the instant case, Plaintiffs' allege that the Sheriff excluded them from the regular rotation list, and limited them to Area 4 on the stand-by list because Plaintiffs did not politically support the Sheriff and did not contribute to the Sheriff's campaign. Plaintiffs further allege that the Sheriff took these actions in part to promote the interests of Monroe Towing as well as Owens Towing inasmuch as those entities provided the Sheriff with political support and campaign contributions. The district court held that Plaintiffs had not adduced sufficient evidence to survive summary judgment on their political patronage claim.

The district court placed undue emphasis on Plaintiffs' failure to present evidence that the Sheriff had formally solicited them for a campaign contribution or that they had been vocal opponents of the Sheriff before 1995. In *Acosta-Orozco v. Rodriguez-de-Rivera*, 132 F.3d 97, 101-02 (1st Cir. 1997), the United States Court of Appeals for the First Circuit explained that "a plaintiff need not produce direct evidence of discriminatory treatment (a so-called 'smoking gun') to

Second, we find that Plaintiffs have presented sufficient evidence to indicate that, after voicing their final comments at the April 25, 1995, Board meeting, they were subjected to an adverse action that would deter a person of ordinary firmness from continuing to engage in publicly criticizing the Sheriff. Plaintiffs were removed from the stand-by tow call list, thus ending any opportunity to receive business via central dispatch or to be added to the regular tow rotation so long as the Sheriff remained in office. There is no doubt that such conduct would deter the average wrecker service operator from voicing similar criticisms of the Sheriff.

Third, we find that Plaintiffs have presented overwhelming evidence that their removal from the stand-by tow call list was motivated by their constitutionally protected public criticism of the Sheriff's Department. The May 4, 1995, letter informing them of their removal expressly states that the action was being taken because Sottile voiced his complaints publicly before the Board rather than in private:

> Since a dialogue had already been opened in regard to your grievance with our office, your appearance before the County Board can only be viewed as an attempt to discredit the Office of the Sheriff. The Office of the Sheriff will therefore no longer be requiring your services as a standby Wrecker Company.

(J.A. at 259.) In his deposition, the Sheriff stated that Plaintiffs were removed from the stand-by list for the same reasons that Lucas was removed from the regular rotation. The Sheriff's Department, of course, informed Lucas that he was being removed because of "the accusatory remarks about the Sheriff and his wrecker policy [he] made before a Board of Commissioner's meeting on April 11, 1995." (J.A. at 153.) Therefore, we find that the district court erred in granting Defendants' motion for summary judgment on Plaintiffs'

---

of the County, is a matter of political concern.

---

description of how the call list is administered. The story also included Plaintiffs' allegations, echoing those of Lucas, that the Sheriff was guilty of favoritism.

Nearly two weeks later, on April 25, 1995, Sottile again addressed the Board regarding (i) the Sheriff's unfulfilled promise to place him on the regular call list rotation; (ii) the Sheriff's suppression of competition among wrecker services; and (iii) the lack of fair play and justice in the Sheriff's Department.

Two days later, on April 27, 1995, the *Monroe Evening News* ran yet another story on the call list controversy; this story also featured Sottile's latest remarks to the Board and the ensuing reaction. Entitled "McKart enters fray over tow trucks," the article reported that at the Board meeting, County Commissioner Jerry McKart joined in the criticism of the Sheriff's Department and called for changes in policy following Sottile's remarks. McKart opined that there was something wrong with the Sheriff's policy and expressed concern that the County might be subjected to lawsuits. The article directly attributed both McKart's comments and the Board's decision to have its attorney examine the call list policy to Sottile's statements at the Board meeting. The article then reported Ray Copi's comments siding with Sottile, and included the response of the Sheriff's Department. The Sheriff's Department alleged that Sottile's comments were orchestrated by Commissioner Zorn, who, as already noted, was head of the County's Committee examining the possibility of combining central dispatch with the County's Emergency Management Division – a move the Sheriff opposed because it would wrest central dispatch from his control.

In a letter dated May 4, 1995, the Sheriff informed Sottile that Plaintiffs had been removed from the stand-by call list due to his public criticisms of the Sheriff's Department. The letter read, in pertinent part:

> Rather than follow up on the matter with Sheriff Van Wert, or his representative, you appeared before the

County Board of Commissioners with your complaint. Since a dialogue had already been opened in regard to your grievance with our office, your appearance before the County Board can only be viewed as an attempt to discredit the Office of the Sheriff. The Office of the Sheriff will therefore no longer be requiring your services as a standby Wrecker Company.

(J.A. at 259.) Plaintiffs were not placed on the tow call list until the Sheriff left office in January 1997; the newly elected sheriff promptly allowed Plaintiffs to join the regular tow rotation.

### *Standard of Review*

We review a district court's grant of summary judgment *de novo. See Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The facts and inferences drawn therefrom are to be viewed in the light most favorable to plaintiff. *See Jackson*, 168 F.3d at 909. Ultimately, this Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Terry Barr Sales Agency, Inc v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

### DISCUSSION

### I.  Retaliation for Public Criticism

Plaintiffs allege that Defendants removed them from the stand-by call list as retaliation for Sottile's public criticism of the Sheriff, in violation of Plaintiffs' First Amendment

We may quite readily concede that Chappel hoped to gain from his speech. Indeed, this may be a fair assumption to make about most speech addressing matters of public concern. Our aim, however, is to determine whether Chappel's speech may be "fairly characterize[d] . . . as relating to any matter of political, social, or other concern to the community." Even if we were to assume that Chappel's predominant motivation was securing a job for himself, we would not conclude that this motivation so dominated the substance of Chappel's speech that the "point" or "communicative purpose" of his speech was rendered merely a matter of personal concern. Chappel directly addressed matters that are rightly "near [the] zenith" of public concern -- matters of public safety, and the gross mismanagement and misappropriation of public monies.

131 F.3d at 578 (alterations in original). We find that the same holds true here. Plaintiffs need only show that their speech somehow related to a matter of community concern. As set forth above, with respect to the subject of favoritism and unfairness in the disbursement of government benefits, tow calls are a classic issue of community concern. Indeed, Sottile made his comments at various public forums, and his comments were widely reported in prominently featured newspaper articles, clearly demonstrating that the community deemed the issues raised to be of public concern. *See id.* (holding that the Plaintiff's speech was a matter of public concern where, among other things, it was made in public forums and covered extensively in the local press).[5]

---

[5]We look to the comments of Commissioner McKart and Ray Copi in response to Sottile's speech as further evidence that Sottile's April 25, 1995, speech was a matter of community concern. In the letter removing Plaintiffs from the stand-by list, the Sheriff's Department described Sottile's speech as an "attempt to discredit the Office of the Sheriff." This is clearly a matter of public concern. *See Chappel*, 131 F.3d at 573 (stating that speech addresses a matter of public concern when such expression is related to, among other things, any matter of political concern). Certainly speech which questions the credibility of the Sheriff's Department, a Department that provides services to the people

In the instant case, Sottile repeatedly accused the Sheriff of favoritism, lack of competition and unfairness in his administration of the tow call list, alleging that the Sheriff used his authority to reward political supporters and campaign contributors at the expense of other tow companies. This Court has expressly stated that: "Freedom to criticize public officials and expose their wrongdoing is at the core of First Amendment values, even if the conduct is motivated by personal pique or resentment." *Barrett*, 130 F.3d at 263. Moreover, the First Amendment protects Sottile's right to voice concerns and criticize the Sheriff and his policies. *See Glasson v. City of Louisville*, 518 F.2d 899, 904 (6th Cir. 1975) ("The right of an American citizen to criticize public officials and policies and to advocate peacefully ideas for change is the central meaning of the First Amendment") (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 273 (1964)).

Notably, Sottile made his comments at the same time that the Board was contemplating the merger of central dispatch with emergency services. Sottile himself placed his comments in the context of this larger issue, by making comments such as, "That's all I want to say to the Board so you can take it into consideration with Central Dispatch cause as far as I'm concerned there's no justice or fair play or anything in the Sheriff's Department right now." (J.A. at 318-19.) In addition, Sottile's comments at the April 25, 1995, Board meeting followed Larry Lucas' speech at the same forum two weeks earlier, where Lucas voiced similar complaints about the Sheriff's administration of the tow call list. Lucas' speech, as noted, was the subject of the lead story in the next day's local paper — a story that also quoted Sottile as joining in Lucas' criticisms.

In *Chappel*, this Court expressly rejected the defendants' argument that the Plaintiff's speech did not address a matter of public concern because it was predominantly motivated by his own self-interest:

rights.[4]  The district court dismissed this claim on grounds that Plaintiffs were not protected under the First Amendment because Plaintiffs were not government employees or contractors, nor were Plaintiffs a regular provider of services to the County.

In dismissing Plaintiffs' First Amendment retaliation claim, the district court adopted Defendants' position that First Amendment protections extend only to independent contractors or other regular-service providers subject to termination of pre-existing commercial relationships with the government. The Supreme Court has consistently held that the "government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech' even if he has no entitlement to that benefit." *Board of County Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (quoting *Perry v. Sinderman*, 408 U.S. 593, 597 (1972)). The Court explained as follows:

> [E]ven though a person has no "right" to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests -- especially, his interest in freedom of speech.

*Perry*, 408 U.S. at 597.  As set forth more fully in *Umbehr*'s companion case of *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 717 (1996), placement on a

---

[4]Because Plaintiffs' rights under the Michigan Constitution essentially track those guaranteed by the United States Constitution, the same analysis that governs their federal constitutional claims applies to their corresponding state claims. *See Woodland v. Michigan Citizens Lobby*, 378 N.W.2d 337, 343 (Mich. 1985) (noting that the rights to free speech and association under the Michigan Constitution are coterminous with those under the First Amendment); *Roy v. Rau Tavern, Inc.*, 423 N.W.2d 54, 56 (Mich. Ct. App. 1988) (stating that the "Michigan Constitution secures the same right of equal protection and due process as does the United States Constitution").

municipal tow rotation list is one such benefit that may not be denied a person because of his constitutionally protected speech.

In this case, Defendants have admitted that Plaintiffs were placed on the stand-by tow call list for Area 4. Even though Plaintiffs did not receive any calls during their four-week stint on the stand-by list, their inclusion on the list undeniably constitutes a governmental benefit. The Sheriff himself admitted that "it was important to be on the tow list because it gives [tow truck operators] community recognition." (J.A. at 292.) Moreover, the Sheriff stated that placement on the stand-by list was "done so that a record with our office can be established," thus allowing a wrecker service to eventually receive tow calls off the regular rotation. (J.A. at 259.) Finally, as Plaintiffs note, their inclusion on the list could have been used in advertising or as a credential when applying for other tow lists — which are particularly important to a new company.

The instant case is reminiscent of *Blackburn v. City of Marshall*, 42 F.3d 925, 929 (5th Cir. 1995), in which the plaintiff wrecking service was removed from the city's rotating on-call towing list after making various complaints to city officials. The plaintiff brought a § 1983 action against the city alleging, among other things, that the city wrongly retaliated against him for the exercise of his First Amendment rights. *Id.* at 930. The district court dismissed the Plaintiff's retaliation claim on the basis that he was not a public employee, or equivalent to a public employee, and thus was not entitled to First Amendment protection against the city's retaliatory conduct. *Id.* at 931. On appeal, the United States Court of Appeals for the Fifth Circuit expressly rejected this notion:

At the outset, we reject the district court's apparent assumption that only public employees enjoy the protections of the First Amendment. The district court's reasoning is inverted. Every citizen enjoys the First Amendment's protections against governmental

interference with free speech, but the First Amendment rights of public employees are restricted by the nature of the employer-employee relationship.

*Id.* Likewise, in the case at hand, we conclude that the district court erred in dismissing Plaintiffs' retaliation claim on grounds that they were not entitled to First Amendment protection against the retaliatory conduct of the Sheriff's Department.

Since the district court held that Plaintiffs were not entitled to any First Amendment protections, the court did not consider whether Plaintiffs presented sufficient evidence on their retaliation claim to survive Defendants' motion for summary judgment. We believe that they have. To prevail on their retaliation claim, Plaintiffs must establish (i) that they were engaged in constitutionally protected conduct; (ii) that Defendants' adverse action caused them to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that conduct; and (iii) that the adverse action was motivated at least in part as a response to the exercise of their constitutional rights. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*); *see generally Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977); *Ratliff v. Wellington Exempted Village Schs. Bd. of Educ.*, 820 F.2d 792 (6th Cir. 1987); *Barrett v. Harrington*, 130 F.3d 246 (6th Cir. 1977). We believe that Plaintiffs have adduced substantial evidence in support of each element.

First, Plaintiffs have clearly established that they were engaged in constitutionally protected conduct. The First Amendment protects speech that may be "fairly characterized as constituting speech on a matter of public concern." *Chappel v. Montgomery County Fire Protection Dist. No. 1*, 131 F.3d 564, 573 (6th Cir. 1997). "In order to conclude that speech addresses a matter of public concern, 'this court must be able to fairly characterize the expression as relating to any matter of political, social, or other concern to the community.'" *Id.* at 574 (citation omitted).