**Jack BRAGG, Plaintiff–Appellant,**

v.

**David H. MADISON, in his personal capacity and in his official capacity as Mayor of the City of Bexley, Ohio; and City of Bexley, Ohio, Defendants–Appellees.**

No. 00–3237.

United States Court of Appeals, Sixth Circuit.

Aug. 31, 2001.

279

Before BOGGS and CLAY, Circuit Judges; and WISEMAN, District Judge.[*]

[*] The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

BOGGS, Circuit Judge.

Plaintiff Jack Bragg appeals the district court's decision granting summary judgment to defendants David H. Madison and the City of Bexley, Ohio, in this action alleging various federal and state law claims related to actions that Bragg alleges Madison took against him in retaliation for Bragg's testifying before a grand jury investigating Madison's operation of the mayor's court of the City of Bexley. For the following reasons, we affirm.

I

On August 31, 1994, investigators from the offices of the Franklin County sheriff and prosecutor searched the Bexley city offices and seized records in connection with an investigation of alleged improprieties in Madison's operation of Bexley's mayor's court. Soon after the search, Bragg, the lieutenant and second-highest ranking official in the Bexley police department, and Thomas W. Tobin, Bexley police chief, were served with grand jury subpoenas, compelling their testimony regarding the operation of the mayor's court. Bragg testified before a Franklin County grand jury in early September 1994. He also met with the Franklin County Sheriff's Department and the Franklin County Prosecutor's Office.

Bragg claims that Bexley's city prosecutor, William Porter, attempted to interview Bragg and Tobin about the investigation and encouraged Tobin to write a letter to the officers of the police department telling them not to cooperate with the investigation. In addition, Bragg claims that the city attorney, Jim Gross, "came in" while Porter was talking to Bragg and Tobin. Gross and Porter testified, however, that they were merely attempting to do their jobs and that they were trying to protect the interests of Bexley. They claim that they instructed Bragg and Tobin that they

should cooperate with the investigation and they should consult with Gross during the investigation.

On May 31, 1995, Madison, who had served as mayor of Bexley since 1976, resigned from office as part of a plea agreement with the county prosecutor's office. The plea agreement did not prevent Madison from running for office in the future. In the fall of 1995, Madison was again elected mayor of Bexley, taking office in January 1996. Tobin and Bragg continued to serve in the police force after Madison's resignation and remained in their positions after Madison returned to office.

Bragg and the defendants present very different descriptions of the facts concerning the relationship between Bragg and Madison after the grand jury investigation commenced.

Bragg states that Madison blamed Tobin and Bragg for the investigation. Bragg relies on Tobin's deposition, in which he testified that Madison stated, "I'm really surprised at you, why you did this to me." Bragg also claims that Madison threatened Tobin and Bragg. Bragg cites Tobin's testimony that on Madison's last day in office before resigning, Madison told Tobin and Bragg that "I won't forget and I'll be back" and "I won't forget this and I won't forget you." Bragg claims that the threats continued after Madison took office again. He relies on Tobin's testimony that Madison told Tobin and Bragg, "You see, I was true to my word. I'm back. And I haven't forgotten" and "I'm going to make what I said come true, what I told you back before I left."

Bragg states that after his return to office, Madison engaged in acts of retaliation. Tobin resigned as police chief soon after Madison returned as mayor. Bragg claims that Bexley had "always promoted

its second-highest-ranking police officer" to chief of police when the chief left.[1] Bragg was appointed acting chief by Madison and was given a pay raise. Bragg states, however, that rather than appointing him to be the new chief, Madison instead created a search committee to find a successor for Tobin. Bragg claims that Madison used his power to appoint the new chief as a means of retaliating against Bragg for his grand jury testimony. Bragg states that Madison told him that he would be promoted to chief, but that at the same time attempted to force Bragg to divulge the contents of his grand jury testimony.

The defendants state that Madison decided to hire an independent board, the Ohio Association of Chiefs of Police (OACP), to assist in selecting the next police chief after Tobin resigned. The defendants point out that there was an open application process in which anyone, including Bragg, could submit his name for consideration. The OACP would determine a "short list" of the most qualified candidates, who Madison and the Bexley city council would consider for the position. The defendants state that Bragg never submitted an application to the OACP. Bragg submitted a letter of intent to the City of Bexley, but he later withdrew his name and failed to file a formal application with the OACP. A new police chief, from among those finalists recommended by the OACP, eventually was selected by Madison and approved by the City Council.

Bragg also claims that Madison attempted to undermine Bragg's position as acting chief. Bragg complains that Madison interfered with and questioned Bragg's disciplinary practices. Specifically, Bragg cites a meeting during which Bragg testified that Madison stated, "some people on council said the only reason I'm going after this so hard is because I don't like you." Bragg testified that during the meeting, Madison started "pounding on me, he's hammering on me." Bragg then began having chest pains and started to choke and have difficulties breathing.

The defendants point out that this meeting was held in response to an incident involving a Bexley police officer who brought a live grenade into police headquarters. After an investigation, Bragg decided not to discipline the officer. Bragg was summoned to two meetings with Madison and Bexley's city attorney to discuss the incident. During one of these meetings, Bragg began to experience his health problems.

Bragg also claims that Madison told Bragg how to handle his cases. Bragg describes a specific incident concerning an ongoing investigation in which Madison told him to go "shut up" a woman who alleged that a Bexley police officer had solicited sex from her and had used the Law Enforcement Automated Data System to check up on her. Bragg also raises another incident where he and Madison disagreed about disciplining an officer involved in a high-speed chase. In addition, Bragg claims that Madison undermined his authority by ordering a police cruiser to escort a sports team without speaking with him first and by ordering police officers to do detail partially out of uniform. Bragg states that Madison criticized Bragg in front of officers from the Bexley police force, an action that Bragg clams had not

---

1. Defendants point out that the last time a new police chief was appointed in Bexley was in 1976, when Tobin, who had been lieutenant, replaced the previous police chief who was removed after a vote of no confidence.

Defendant Bexley also states that Bragg fails to provide any support for his statement that the city has always appointed the lieutenant as the new police chief.

been done prior to the grand jury investigation. Bragg also testified that every time he attempted to talk to Madison, the mayor brought up the criminal investigation. The defendants state that Madison was acting within the scope of his duties as mayor and that there was never a requirement in Bexley that the mayor agree with all the decisions made by the police chief.

In November 1996, Bragg states that he became ill as a result of the harassment from Madison, causing him to seek injury leave and to withdraw from the selection process for the new police chief. The defendants point out that after taking leave, Bragg was eventually dismissed from the police force because of his failure to report to work and to provide any medical authorization supporting his leave.

Bragg filed a complaint in federal district court on January 30, 1997, alleging claims under federal and state law. After two amended complaints were filed and discovery was conducted, the defendants moved for summary judgment in November 1999. The district court granted summary judgment to the defendants on January 18, 2000.

## II

### A

Bragg claims that the defendants retaliated against him for exercising his constitutional rights. Bragg asserts this claim under federal law, pursuant to 42 U.S.C. § 1983, and state law, pursuant to Article 1, Section 11 of the Ohio Constitution, which states that "[e]very citizen may freely speak, write, and publish his sentiments on all subjects."

In order to prove a claim for retaliation, Bragg must establish three elements: (1) that he was engaged in a constitutionally protected activity, (2) that the defendants' adverse action caused him to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity, and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. *See Bloch v.. Ribar*, 156 F.3d 673, 678 (6th Cir.1998).

Bragg can establish two of these three elements for purposes of summary judgment. With regard to the first element, the parties do not dispute the fact that Bragg's grand jury testimony was a constitutionally protected activity. Concerning the third element, there is a genuine issue of material fact as to whether the defendants' actions were motivated at least in part as a response to Bragg's grand jury testimony. Bragg has presented evidence from Tobin's deposition testimony that Madison made statements such as "I won't forget this" before he left office and "I haven't forgotten" when he returned to office. In addition, Bragg testified that Madison kept bringing up the criminal investigation after he was again elected mayor.

Bragg is unable to demonstrate that there is a genuine issue of material fact as to the second element of the retaliation inquiry, however. There is no evidence indicating that the defendants took an "adverse action" against Bragg that would likely chill a person of ordinary firmness from continuing to engage in a constitutionally protected activity.

Bragg argues that he can assert a claim for injury based on "impairment of reputation ... personal humiliation, and mental anguish and suffering." *Id.* at 679 (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986)) (internal quotations omitted). Bragg relies on various evidence in the record indicating that he was injured because of the embarrassment, in-

timidation, and humiliation he felt he suffered as a result of the defendants' actions.

█ Establishing injury is only one component of the second element of a retaliation claim. Bragg cannot demonstrate that his injury was based on an adverse action of the defendants that would likely chill a person of ordinary firmness from continuing to engage in a constitutionally protected activity. All of the actions that Bragg refers to in support of his retaliation claim are normal disagreements that could occur between a mayor and a police chief in carrying out their respective duties. For example, Bragg and Madison disagreed about whether a patrol officer should be reprimanded for carrying a live grenade into the Bexley police station. Bragg did not discipline the officer, but Madison believed the officer should have been reprimanded. Other incidents are similar. Madison was upset with Bragg regarding an investigation into a woman's claims that a Bexley officer solicited sex from her and used a law enforcement information system to check up on her. Madison and Bragg disagreed over whether an officer should be reprimanded for his involvement in a high-speed police chase. Bragg also complained that Madison ordered a police cruiser to escort a sports team without consulting with him and ordered police officers to do detail partially out of uniform.

In *Bart v. Telford,* 677 F.2d 622, 624, 625 (7th Cir.1982), the Seventh Circuit held that an "entire campaign of harassment" in which an employee was subjected to "baseless reprimands" and "harassment and ridicule through selective enforcement of work rules" was sufficient to establish adverse action for purposes of a retaliation claim. The plaintiff in *Bart* was a city employee who left her job to run for mayor and then returned to her position after she aborted her effort early in the campaign season. She claimed that the mayor retaliated against her for running for office. The court denied the defendants' motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6). The plaintiff supported her claim with an allegation that the mayor "orchestrated a campaign of petty harassments" and held her up to ridicule for bringing a birthday cake into the office to celebrate an employee's birthday, even though it was common practice to do so. *Id.* at 624. The court ruled that the plaintiff had alleged "an entire campaign of harassment which though trivial in detail may have been substantial in gross." *Id.* at 625.

Bragg's case is distinguishable from *Bart.* Bragg does not allege an "entire campaign of harassment," but rather specific incidents in which he and Madison disagreed about the operation of the Bexley police force. In each case, there was at least some basis for disagreement and in some cases, such as the incident in which Bragg did not discipline the officer who brought a live grenade into Bexley police headquarters, there was a basis for Bragg to be criticized. Bragg's general assertion that these disagreements would not have occurred prior to his grand jury testimony is not enough to avoid summary judgment. Bragg has not alleged, for example, that Madison began to enforce city rules that had not been enforced in the past or that Madison criticized Bragg for a series of trivial actions. He argues only that he and Madison disagreed over the operation of the police force and that such disagreements would not have occurred before Bragg's grand jury testimony. This is not enough to withstand summary judgment.

This court's prior decisions holding that a plaintiff demonstrated an adverse action for purposes of establishing a retaliation claim also are distinguishable. For example, in *Ribar,* the court held that the plain-

tiffs, a rape victim and her husband, stated a retaliation claim against a county sheriff when the sheriff released private details of the rape after the plaintiffs criticized the sheriff and his department for their handling of the case. 156 F.3d at 676, 681. In *Barrett v. Harrington*, 130 F.3d 246, 262, 263 (6th Cir.1997), the court denied the defendant's motion for summary judgment where the plaintiff, who had published statements critical of a state court judge before whom he appeared, claimed that the judge issued statements to the press accusing him of stalking, harassing, and otherwise intimidating her. The court specifically noted that the judge admitted in deposition testimony that, in her opinion, the plaintiff was not violating any stalking laws, yet she still repeatedly accused him of stalking. *Id.* at 263. The court determined that the judge would not have made her unfounded statements to the media if the plaintiff had not criticized her. *Ibid.* Bragg has not alleged that the defendants issued confidential, humiliating information, as in *Ribar*, or that they made baseless allegations, such as the stalking accusation in *Barrett*. Instead, Bragg rests his claims on disagreements over police policy.

■ Bragg is also unable to demonstrate that the fact that he is no longer on the Bexley police force and that he was not appointed the new police chief constitute an adverse action. This court has held that being discharged from employment can be an adverse action for purposes of a retaliation claim. *See Ratliff v. Wellington Exempted Village Sch. Bd. of Ed.*, 820 F.2d 792, 796 (1987). Bragg provides no evidence indicating that the defendants caused him either to leave the Bexley police force or to not be appointed police chief. Bragg left the police force because of health problems and failed to provide medical documentation to support his con-

tinued leave. He also withdrew his name from consideration to be the new police chief and failed to complete the required application materials.

The court in *Bart* noted that, "[i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise—that if the Mayor ... had frowned at Miss Bart for running for public office he would be liable for damages ... under section 1983." 677 F.2d at 625. Similarly, policy disagreements about the operation of a municipal police force are not sufficient to create liability in this case.

## B

Bragg asserts claims under federal and state law that he was constructively discharged by the defendants in violation of his First Amendment right of free speech.

■ First, we note that "[t]he First Amendment is not a tenure provision, protecting public employees from actual or constructive discharge." *Kreuzer v. Brown*, 128 F.3d 359, 364 (6th Cir.1997) (quoting *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 76, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)) (internal quotations omitted). Moreover, Bragg has provided no evidence indicating that the actions of the defendants caused him to leave his employment. The evidence demonstrates that Bragg left his employment with Bexley for medical reasons. Other than his own non-expert testimony, Bragg has offered no evidence that his medical problems were caused by the actions of the defendants. In addition, he does not dispute the fact that he did not submit medical documentation to Bexley to support his need for medical leave. Finally, the issue of whether Bragg was required to submit medical documentation to Bexley was liti-

gated by Bragg, with the Ohio Court of Common Pleas issuing a ruling in favor of Bexley. *See Bragg v. City of Bexley*, No. 98CVH02–1049 (Sept. 28, 1998).

To the extent that Bragg's constructive discharge claim can be read to allege that Bragg should have been appointed the new police chief of Bexley, this claim must fail as well. Bragg admits that he stopped working and withdrew his name from consideration for the position as a result of his health problems. In addition, he failed to submit application materials to the OAPC, which was conducting the search for a new chief. He also has failed to demonstrate either that he was excluded from the search process conducted by Bexley or that the search process was deficient in any other way.

## C

■ Bragg also claims that the defendants engaged in a conspiracy in violation of 42 U.S.C. § 1985. Although Bragg does not explain what subsection of § 1985 he is bringing his claim under, we construe his claim as arising under the second part of § 1985(2), which applies to conspiracies to obstruct the course of justice in state courts. *See Kush v. Rutledge*, 460 U.S. 719, 725, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983). Bragg's claim is presumably based on his allegations that various Bexley city officials, particularly Porter and Gross, discouraged him from testifying to the Franklin County grand jury. Bragg must support his claim with "specific allegations showing the existence of a conspiracy." *Azar v. Conley*, 456 F.2d 1382, 1384 (6th Cir.1972). Bragg offers no specific evidence of a conspiracy. There is no evidence that Porter, Gross, or Madison conspired to prevent Bragg from testifying. The only specific evidence that Bragg offers to support his claim is an allegation that Porter instructed Tobin to write a letter to the officers of the Bexley police department telling them not to cooperate with the investigation. Porter denies that he made this statement. Moreover, even accepting this statement as true, Bragg offers no evidence indicating that the statement was made by Porter in furtherance of a conspiracy. Bragg is unable to offer any evidence that Bexley officials acted in concert with one another in order to prevent Bragg from testifying.

Even if we construed Bragg's claim as arising under § 1985(3), which applies to conspiracies "for the purpose of depriving, directly or indirectly, a person ... of the equal protection of the laws," *Smith v. Thornburg*, 136 F.3d 1070, 1078 (6th Cir. 1998), this claim would also fail because Bragg is unable to demonstrate that there is a genuine issue of material fact as to the existence of a conspiracy.

Bragg's claims also fail for another reason. Under both § 1985(3) and the second part of § 1985(2), Bragg must demonstrate that there was "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Kush*, 460 U.S. at 726, 103 S.Ct. 1483 (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). Bragg alleges no racial or class-based animus as a motivation for the actions that he alleges the Bexley city officials took in conspiring against him.

## D

■ Bragg's final claim is for intentional infliction of emotional distress under Ohio law. In order to prevail on such a claim, a plaintiff must prove that: (1) defendants either intended to cause emotional distress, or knew or should have known that their conduct would result in serious emotional distress to plaintiff; (2) defendants' conduct was so extreme and outrageous as to go beyond all possible bounds

of decency and was such that it can be considered utterly intolerable in a civilized community; (3) defendants' conduct was the proximate cause of plaintiff's psychic injury; and (4) plaintiff suffered serious emotional distress, such that no reasonable person could be expected to endure it. *See Roe v. Franklin County,* 109 Ohio App.3d 772, 673 N.E.2d 172, 180 (1996). In *Reamsnyder v. Jaskolski,* 10 Ohio St.3d 150, 462 N.E.2d 392, 394 n. 1 (1984), the Ohio Supreme Court adopted the standard for "extreme and outrageous" set forth in RESTATEMENT (SECOND) TORTS § 46 cmt. d (1965): "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"

█ Bragg is unable to demonstrate a genuine issue of material fact as to whether the defendants' conduct was so extreme and outrageous as to go beyond all possible bounds of decency such that it could be considered utterly intolerable in a civilized community. At most, Bragg presents evidence that Madison second-guessed decisions he made as acting police chief, criticized certain decisions he made, and was at times difficult to work for. This does not rise to the level that an average member of the community would consider the conduct outrageous, nor that no reasonable person could be expected to endure such work-related conflicts. *See Jackson v. City of Wooster Bd. of Educ.,* 29 Ohio App.3d 210, 504 N.E.2d 1144, 1147 (1985) (stating that intentional infliction plaintiff "must have suffered severe emotional distress and not just embarrassment or hurt feelings").

Bragg's claim also fails because he does not substantiate his claims of emotional distress with any evidence, other than his own testimony, indicating the extent of his medical problems and demonstrating that his emotional injuries were caused by the defendants. *See Dickerson v. Int'l United Auto Workers Union,* 98 Ohio App.3d 171, 648 N.E.2d 40, 50 (1994) (requiring "substantial proof of the claimed mental disturbance" to establish emotional distress in an intentional infliction claim and noting lack of expert testimony as to causation).

## III

For the foregoing reasons, the judgment of the district court is AFFIRMED.